WILLIAM BEADENKOPF CO. v. HENWOOD & NOWAK, Inc.

(District Court, D. Massachusetts. July 27, 1926.)

No. 2451.

1. Contracts ⬤280(1)—Contract to tan skins held to imply an agreement to so do the work as to produce good merchantable leather.

A contract by plaintiff to tan skins for defendant, which gave defendant the right to terminate the contract if plaintiff was unable to manufacture the skins into good salable finished leather, *held* to imply an agreement by plaintiff to so do the work as to produce good merchantable finished leather.

2. Contracts ⬤280(1).

Defendant *held* not entitled to recoup, against the contract price for tanning goat skins, damages from spotting due to leaving skins in puering solution too long, when done at its request and over tanner's objection.

At Law. Action by the William Beadenkopf Company against Henwood & Nowak, Inc. Judgment for plaintiff.

Lyman K. Clark, of Boston, Mass., for plaintiff.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for First National Bank, alleged trustee.

Francis T. Leahy, of Boston, Mass., for defendant.

BREWSTER, District Judge. This is an action of contract, brought by the plaintiff for tanning and coloring a quantity of goat skins for the defendant. The plaintiff alleges that the defendant owes it the sum of $10,517.55. Of this amount the plaintiff claims that there is due it $9,280.52 for work done in tanning leather for the defendant, $926.17 for certain items of expenses made pursuant to the contract existing between the parties, $608.74 for commissions on sales of hair, and interest on notes and invoices amounting to $961.99.

In order to narrow the issues to the real controversy, the parties stipulated that the plaintiff received from the defendant the number of goat skins set out in its declaration, that they were tanned by the plaintiff and returned by it to the defendant, and that the price set out in the declaration was the agreed price then in force. I understand that there is no serious dispute with reference to the items of expenses or commissions.

The defendant asserts the right to recoup for damages resulting from the alleged failure of the plaintiff to tan the leather according to its agreement. The first question presented, therefore, is whether the plaintiff in all respects fully performed its contract with the defendant pursuant to which the work was done for which the plaintiff now seeks to recover.

The material facts, as I find them from all the evidence, are as follows:

The plaintiff and defendant began their business relations on October 16, 1918, when a contract, evidenced by correspondence, was entered into by which the plaintiff agreed to tan China goat skins at a stipulated price per dozen. In this agreement, it was provided that the skins were "to be tanned into good salable leather." Later, in 1921, by correspondence bearing date of March 4, 1921, a new agreement was entered into which was as follows:

"Confirming writer's conversation with your Mr. Clarence Beadenkopf, we desire to outline the arrangements which we understood are satisfactory to both parties as follows:

"We are to give you all the skins which we purchase to tan for us within the year from date. These skins are to be tanned for us on the basis of $5.50 (five dollars fifty cents) per dozen for skins averaging fifty-five feet. The rate of decrease or increase, below and above this average spread, to be on the same scale that we have been working on in the past.

"It is understood this price is for blacks, Havana brown, and golden browns, which we feel are a stable with you and require no more effort for you to manufacture than blacks or Havana browns.

"It is agreed that we will pay you at the rate of $6.00 (six dollars) per dozen for any different colors, which we may desire manufactured. Of course, we are to get the proceeds from all hair as in the past.

"This agreement is to continue in force after one year unless notice is given by either party of a desire to terminate same at least three months in advance. We also agree that, should we at any time in the future start a plant of our own, we will not tamper with your organization or hire people away from you, who are actually in your employ.

"Nothing, however, in this agreement, is to be construed as binding us to continue giving you skins, should it develop that you, for any reason whatever, are unable to manufac-

ture the skins into good salable finished leather of a workmanship and quality equal to that leather manufactured for us in the past, which was satisfactory.

"It is further understood and agreed that if there should be a marked advance in laboring or finishing materials that we are willing to agree to a proportionate advance in the cost of finishing. Should there be a decline in either labor cost or materials costs, you are to promptly give us the benefit of this cost in a proportionate reduction on our finishing costs. Should there arise other circumstances which would permit a reduction in manufacturing costs, we are to get full benefit of same.

"We trust you will find this letter in order, and it is executed in duplicate. We would ask you to kindly sign and return to us one copy.

"Very truly yours,
"Henwood & Nowak, Inc.
"[Signed]  David D. Henwood.
"Accepted for Wm. Beadenkopf Company by
"[Signed]  C. M. Beadenkopf,
"Vice Pres."

[1] It should be noted that under this letter there is no express agreement to tan the skins into good salable leather, but the defendant expressly reserved the right to terminate the contract, if the plaintiff was "unable to manufacture the skins into good salable finished leather of a workmanship and quality equal to that leather manufactured for us (defendant) in the past, which was satisfactory."

I am of the opinion, and I rule that, in view of this provision, and probably independent of it, there was an implied agreement on the part of the plaintiff that whatever work it did for the defendant under the contract it would do in a good and workmanlike manner, and redeliver to the defendant finished leather that was merchantable.

[2] In order to settle issues arising in this controversy, it will be necessary to consider somewhat the processes entering into the tanning and coloring of the skins, and the acts of the parties with reference to the particular skins in question. The first step in the process of tanning is to remove the hair from the skin, and then it is washed, puered, tanned, colored, oil-staked, seasoned, and finished. In this case we are concerned principally, if not wholly, with the puering of the skins. After the skin is dehaired and washed, it is then put into a chemical bath, known as the "puer," which brings out the grain of the skin, so that after it is tanned and dyed it is suitable for use in manufacturing ladies' shoes. The chemicals attack the grain of the skins, rather than the flesh side.

This process of puering has an important effect upon the quality of the finished leather, and the more it is puered the finer the grain and the smoother the skin; but, if this puering process is carried too far, it results in what is known in the art as "flowering," or develops what the trade frequently refers to as puer stains. If a skin is flowered, it will not take a uniform color, and, when a skin is colored a light, or delicate, color, such stains will show up clearly. If colored brown, the stains will appear less distinctly, and will very nearly, if not wholly, disappear when colored black. If it appears that the skin is so badly puer-stained in the light colors as to affect the marketability of the skin, it can be recolored black and may be sold as a black skin. When the demands of the trade call for leather in light shades, such skins command in the market a higher price than either brown or black, and brown skins usually command a higher price than black.

Some skins have a coarser grain than others, so that, when subjected to the puering process, the coarser-grained skin will stand more puering without flowering than will fine-grained skin. In the tanning of these skins it is not practicable to wholly eliminate puer stain. If a small proportion of any lot of skins tanned turned out to be puer-stained, it does not necessarily indicate that the skins have been improperly puered.

For some little time prior to the work in question, the defendant had been especially desirous of obtaining smooth, fine-grained skins, and had been constantly urging the plaintiff to "puer the skins lower," in order to accomplish this result. Both the plaintiff's president and its employee who supervised the puering process had remonstrated and suggested to the defendant's president, Henwood, that if they puered the skins lower it would result in flowering, and that it (the plaintiff) would not assume the responsibility for an excess of puer stains. The defendant nevertheless requested the plaintiff to puer down the skins to the lowest possible point, and said that it would assume the responsibility, preferring to have some of the skins flower, rather than to have them rough.

The plaintiff's tannery is situated in Wilmington, Del., and the defendant's principal place of business is in Boston, Mass. The defendant had a representative at the plaintiff's tannery, whose duty it was to inspect

and assort the skins, and to supervise the preparation for shipment to the plaintiff or its customers.

In the summer of 1923, the plaintiff tanned and finished goat skins for the defendant, and delivered same between August 3 and August 25, 1923. These skins constituted the whole or portions of several lots, which were designated by lot numbers. The controversy centers around lots numbered 95, 96, 97, 98, and 100. At the trial, the defendant, in computing his damages, confined his losses to those resulting from lot No. 100, and it therefore will be necessary to consider the evidence with reference to that lot.

It appears that the defendant, some time in June, 1923, purchased and caused to be shipped to the plaintiff's tannery a lot of China goat skins, known as "Szechuans," which is a high grade of China skin, but of this lot 3,870 skins were designated as Hankow seconds, and were invoiced at one-half the price of Hankow firsts. These skins were to be tanned and colored a light shade, known to the trade as "field mouse," a color which at that time was in demand. The skins were subjected to the usual processes in the usual manner; the plaintiff endeavoring to puer them low in accordance with the request of the defendant. As a result, many of the skins were flowered. The condition was discovered by the defendant's inspector at the tannery, and on his instructions some of the skins were dyed either Havana brown or black. Some of them were first dyed field mouse, and, on his instructions, were recolored black. The final result respecting this lot was that the plaintiff finally delivered to the defendant 303⁹⁄₁₂ dozen of the field mouse, 426⁵⁄₁₂ dozen of the Havana brown, and 521¹¹⁄₁₂ dozen of the black. For work done on lot No. 100 the plaintiff has charged the defendant $6,475.71.

In respect to the work done on other lots, very little evidence was offered, except what appears from the correspondence and the invoices. From these sources it appears that the plaintiff received, tanned, and redelivered to the defendant 306¹¹⁄₁₂ dozen skins in lot No. 98, of which 171½ dozen were colored field mouse, 109¹⁹⁄₁₂ dozen Havana brown, and 25⁷⁄₁₂ dozen black. For work done on this lot, the plaintiff is seeking to recover $1,636.14. The plaintiff received, tanned and redelivered to the defendant 193¾ dozen skins in a lot No. 96, of which 120⁴⁄₁₂ dozen were invoiced as stained skins, 60⁷⁄₁₂ dozen as field mouse, and 12¹⁹⁄₁₂ dozen as blacks. The plaintiff charges for work on lot No. 96 $812.93.

The plaintiff also tanned other lots, for which it has charged in the aggregate the sum of $356.84, making a total of $9,280.52, which the plaintiff claims the defendant owes it for the work in tanning and finishing leather for the defendant.

During the progress of the work, the defendant's representative inspected the skins, both before and after they were dyed, and noticed that they were coming through with an unusual proportion of flowered skins. He communicated this fact to the defendant, and received instructions regarding them from time to time, but at no time did he order the defendant to cease work, nor did he or any one on behalf of the defendant indicate to the plaintiff that the work would not be paid for at the stipulated prices.

On August 24, 1923, the defendant wrote to the plaintiff a letter, which was not received until after the last shipment had gone out of the tannery. This letter was as follows:

"We are just getting our figures in for the various lots which have gone wrong in the factory, and I am herewith giving you the results as far as we know them.

"On lot No. 100 you had to recolor into blacks 515 dozen on account of puer stains. This lot would stand us 40 cents on the counter as colors. As blacks they are hardly worth more than 22 cents and at that we have no sale for the better grades. On lot No. 98 65 dozen have gone into blacks on account of puer stains. These skins cost us 29 cents on the counter. On lots 95, 96, and 97 there were 300 dozen which were so badly discolored, owing to your inability to handle them in the cellar, that we had to sell them as trimming stock. We secured a trifle under 20 cents for these skins.

"These losses were entirely due to causes which were within your control, and we feel that we should look to you for proper compensation for them. We should be glad to give you any further information or data upon these lots that you desire. We have not taken into account any of the hair which may have been sold on these particular lots.

"Writer would like to know what you propose to do about this matter, as I expect to be in Wilmington the latter part of next week, and will call on you at that time.

"Please advise Miss Salmon that we will try to send her a substantial check during next week.

"Very sincerely,
"[Signed]   David D. Henwood."

Upon receipt of this letter the plaintiff wrote to its representative in Boston, and as a result of this letter the representative visited the defendant and talked with its president, Henwood, and after the conference wired the plaintiff. I admitted the telegram in evidence as tending to prove the fact that a telegram was sent imparting certain information to the plaintiff, but not as evidence of the conversation that took place between Henwood and plaintiff's representatives. There was competent testimony respecting this conversation, but from this evidence I do not find that the defendant at that time waived any rights which it then had, and I seriously doubt whether the telegram was justified by anything that Henwood had said.

It appears that, following shortly after this letter of August 24, 1923, the defendant established its own tannery in Wilmington, and thereafter sent no skins to the plaintiff.

The defendant sent to the plaintiff checks on account as follows:

| | | |
|---|---|---|
| October 16 | ..................... | $ 400.00 |
| November 1 | ..................... | 250.00 |
| " 23 | ..................... | 150.00 |
| " 30 | ..................... | 150.00 |
| December 14 | ..................... | 250.00 |
| Total | ..................... | $1,200.00 |

So far as the evidence discloses, nothing transpired between the parties until December 27, 1923, when the defendant sent to the plaintiff a statement, in which he gives the plaintiff credit for the invoices from August 3 to August 25, inclusive, amounting to $9,280.52, and charges the plaintiff with payments as above indicated, and also charges the defendant with an item of $5,206.61 under date of October 31, 1923. The only explanation of the item appearing in this statement was contained in the words, "See letter 8/24." This left a balance due the plaintiff according to the defendant's statement, of $2,873.91, for which amount the defendant sent its 90-day note. This note the plaintiff refused to accept. It was never presented for payment and was surrendered in court.

The defendant's president testified that the item of $5,206.61 was his computation of the losses as set out in his letter of August 24, 1923, and was arrived at by estimating the loss on lots 95, 96, 97, 98, and 100—the loss on lots 95, 96, and 97 being then estimated as $604.80, the loss on lot No. 98 as $72.70, and the loss on lot No. 100 as $4,529.11. In arriving at these estimates, the defendant considered the difference between the cost of the finished skin and the fair market value of the skins as they were received from the plaintiff. But at the trial the defendant offered evidence tending to show that the actual damages sustained by reason of the alleged failure of the plaintiff was largely in excess of this amount; in fact, was in excess of plaintiff's claim.

If the defendant is entitled to recoup, I do not think it is bound by its statement of December 27th, for the reasons, first, that it obviously proceeded on a misconception of the rule governing the measure of its damages; and, second, that it had not then received some 600 dozen skins, which were shipped out subsequent to August 18, 1923. But, before entering upon a consideration of the extent of the defendant's damages, it will be well to determine whether in this action it has established its right to recoup these damages. It appears from the foregoing that an unusually large number of the skins were flowered; that only about 25 per cent. of lot No. 100 were delivered in the field mouse color, the balance being colored Havana brown and black. I am satisfied further from the evidence, that this excess of flowering was due to the fact that the skins were allowed to stay too long in the puering solution, or that the solution was too strong; in other words, were "overpuered" in plaintiff's attempt to puer the skins down to meet the defendant's requests. Were it not for the fact that the defendant was insisting that the skins be puered low, there would be ground for charging the plaintiff with negligence in the performance of its work; but, as already indicated, the defendant was requiring a treatment well calculated to produce the results that followed, and had assumed full responsibility therefor.

The agreement between the parties, as interpreted by them during the course of their dealings under it, did not contemplate that every skin would be finished in any given color, or that every skin colored in a delicate shade would be free from puer stains. The skins delivered by plaintiff and received by defendant were salable skins, even if they did not command the highest price.

Of course, the obligations of plaintiff's contract required a reasonable degree of skill, diligence, and care in the performance of the work. There is no suggestion of any want of care and diligence, except in the fact that the skins were "puered down too low"; but this was done at defendant's request, and the results cannot be attributed to any negligence on the part of the plaintiff, or to any failure on its part to perform its contract. The defendant cannot now complain that the re-

sults were unprofitable to it. The defendant directly, or through its representative, ordered the flowered skins to be run in brown or black, whenever it deemed it advisable so to do. It never rejected any of them. Much of the work done by the plaintiff, for which it now seeks to recover, was done on defendant's orders, after it was fully aware of the excess of puer stains. The defendant's representative was in constant touch with the work, and it was not until some four months after the last delivery that the defendant made any claim for definite damages. It would work a manifest injustice to the plaintiff to throw upon it all the losses which the defendant claims it sustained as a consequence of overpuering, when the treatment to which the skins were subjected was urged by the defendant and disapproved by plaintiff.

I therefore rule that the defendant has not established its right to recoup. In view of this ruling, it becomes unnecessary to consider the extent of any damages suffered by the defendant. I find and rule that plaintiff is entitled to recover in this action $10,517.55, with interest from the date of the writ.

Judgment for plaintiff may be entered accordingly.