**FAIRMONT SHIPPING CORP. and Fairwinds Ocean Carriers Corp., owners of the STEAMSHIP WESTERN EAGLE, Plaintiffs-Appellees,**

v.

**CHEVRON INTERNATIONAL OIL COMPANY, INC., Defendant-Appellant.**

**No. 104, Docket 74–1667.**

United States Court of Appeals, Second Circuit.

Argued Nov. 22, 1974.

Decided Feb. 4, 1975.

Richard G. Ashworth, New York City
(Haight, Gardner, Poor & Havens, Rich-

ard L. Jarashow, New York City, of counsel), for defendant-appellant.

Joseph C. Smith, New York City (Burlingham, Underwood & Lord, New York City), for plaintiffs-appellees.

Before SMITH, HAYS and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Fairmont Shipping Corp. and Fairwinds Ocean Carrier Corp. (collectively referred to as Fairmont) brought this action against Chevron International Oil Company, Inc. seeking to recover for damage suffered by their vessel, the steamship Western Eagle, when she fetched up against a dike in Flushing Roads at the port of Flushing, The Netherlands. Chevron contracted with Norland Shipping & Trading Co., Fairmont's agent, to supply bunkers (fuel oil) to the Western Eagle at Flushing. The contract stipulated that Chevron would also provide tug assistance; it did so through its sub-contractor or agent, Steenkolen Handelsvereeniging (SHV). The tugs, however, did not make fast to the Western Eagle when directed to do so by the pilot, and the vessel, unable to make headway on her own against the prevailing wind and current, drifted into the dike as a result. The United States District Court for the Southern District of New York, Lloyd F. MacMahon, Judge, sitting without a jury, found that a warranty of workmanlike service was implied in the contract to provide tug assistance and that the tugs' failure to make fast constituted a breach of that warranty, and directed that a special master be appointed to ascertain damages. 371 F.Supp. 1191 (S.D.N.Y.1974). We affirm.

## I. THE FACTS

Since Chevron does not challenge on appeal the district court's finding that under the bunker supply contract Chevron was obligated to provide tug assistance,[1] we may proceed directly to the facts as they unfolded at Flushing in the early morning hours of December 14, 1969. At 3:00 a. m. the Western Eagle entered the Scheldt River, eastbound for Buitenhaven, the harbor of Flushing, located on the river's north bank. She took on a local pilot, L. J. Pennarts, at 3:45. Pennarts met the Western Eagle approximately a mile upriver from the pilot station, the normal boarding area, because the pilot boat was late in leaving the harbor. Thus, when Pennarts came on board, the Western Eagle was almost abeam of Buitenhaven. The visibility at that time was poor, but not bad enough to prevent Pennarts from seeing the lights of the pilot station, the lights of the British Statesman (a tanker anchored nearby), and the fog lights on shore, half a mile away. A stiff wind (19–31 m. p. h.) was blowing out of the south, and a flood tide was moving upriver at 2 to 2¼ m. p. h.

As soon as Pennarts got on board, he radioed for the tugs. In the meantime, since the Western Eagle had gone past Buitenhaven, and since the normal practice was for tugs to meet ships over a mile to the west of Buitenhaven, Pennarts decided to turn the Western Eagle back downriver by swinging her to starboard, around the British Statesman, and to wait for the tugs at the normal meeting place in Flushing Roads. But the wind pushed the ship to port, and Pennarts' corrective steps brought him close to a buoy marking the south side of the channel. Rather than risk leaving the channel, Pennarts decided to abandon the attempt to turn the ship by itself; he stopped the engines, and then put them full speed astern, waiting for the tugs.

When the tugs—the Sophia and the Frederik Hendrik—arrived, the Western Eagle was thus considerably upriver from the normal meeting place. Pennarts ordered the tugs to make fast as soon as possible, the Frederik Hendrik to the port bow and the Sophia to the

---

1. In the district court, Chevron denied "the existence of any contract between it and plaintiffs, or the existence of any clause in the contract for pilotage or towage." 371 F.Supp. at 1192.

stern. The Frederik Hendrik took a heaving line, but before it could make fast both it and the Sophia suddenly moved out of position at the approach of a downriver coasting vessel. A few minutes later, a second downriver coaster approached, and again the tugs left the ship; this time, the Frederik Hendrik unfastened the heaving line. The Western Eagle was approximately 1800 feet from the northern shore when the coasters passed, port to port, between her and that shore.

Without the tugs, the Western Eagle was helpless against the wind and the tide. As she drifted toward the northern bank of the Scheldt, the tugs returned to her, but they were not in position to make fast. Despite Pennarts' efforts to keep her from stranding, the Western Eagle ran aground on the dike at 4:15. Later in the day, at high tide, she was refloated and towed to drydock where extensive damage was discovered.

## II. THE EXISTENCE OF A WARRANTY OF WORKMANLIKE SERVICE

The district court held that, because the tugs were in the best position to adopt measures to prevent the accident, but failed to do so and thereby caused the accident, there was a breach of Chevron's implied warranty of workmanlike service. Chevron argues that there was no such warranty in this case because a contract for tug assistance does not entail the relinquishing of control over the vessel's navigation to the tugs. It claims that control is a *sine qua non* to a warranty of workmanlike service.

The landmark case involving warranties of workmanlike service in maritime contracts is Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). *Ryan* was the culmination of a series of cases involving the interlocking relationships among shipowners, stevedoring companies and longshoremen, and must be read with that backdrop in mind.[2] In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), longshoremen were held to be seamen insofar as that status made them persons to whom shipowners owe the duty—an absolute duty, not turning on fault—to provide a seaworthy ship.[3] And in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), it was held that, where the unseaworthy condition was the result of the combined fault of the shipowner and the stevedoring company (the longshoreman's employer), the shipowner was not entitled to contribution from the stevedore as a joint tortfeasor.[4] The rationale for the holding was that the creation of a rule for contribution among joint tortfeasors was a matter for legislative, not judicial action.

After *Sieracki* and *Halcyon*, shipowners were in an unenviable position: A longshoreman might be injured as a result of an unseaworthy condition caused wholly by the stevedore's negligence, and yet the shipowner, wholly without fault, could be held liable for the entire amount of compensatory damages. And this potential liability was made even more painful by the fact that the longshoreman would, in every case, sue the shipowner for unseaworthiness rather than the stevedore for negligence because the latter cause of action had been abolished by the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. § 901 et seq. (LHWCA).[5]

---

**2.** The discussion we set forth is limited to essentials. The history is recounted in detail in G. Gilmore and C. Black, The Law of Admiralty §§ 6–53—6–57, at 358–374 (1957).

**3.** *Compare*, Swanson v. Marra Bros., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946), decided the same day as *Sieracki*, holding that longshoremen are not seamen for purposes of the Jones Act, 46 U.S.C. § 688.

**4.** Under the particular facts in *Halcyon*, the stevedore was found to be 75% at fault, the shipowner only 25%.

**5.** The LHWCA made employers liable without fault to compensate employees for work-connected injuries in amounts determined by schedules of benefits for various types of injuries, and it made that liability exclusive.

The shipowner's plight was "a situation which cried out for relief," H. Baer, Admiralty Law of the Supreme Court § 2-8, at 183 (1963), and that relief was granted in *Ryan*.[6] A longshoreman named Palazzolo was injured by a roll of pulpboard which had been improperly stowed by his employer, Ryan Stevedoring Company. He recovered damages from Pan-Atlantic Steamship Corporation, the shipowner, on an unseaworthiness claim under *Sieracki* and Pan-Atlantic, barred from seeking contribution by *Halcyon*, sought indemnity from Ryan on the contractual theory that Ryan had implicitly agreed to perform its stevedoring services in a workmanlike manner, and that this warranty entailed an agreement to indemnify Pan-Atlantic for any liability which it might incur by reason of an unseaworthy condition created by Ryan's unworkmanlike performance. The Supreme Court, after holding that Pan-Atlantic's action was not barred by the exclusivity provision of the LHWCA, agreed that there was indeed such a warranty, and that Pan-Atlantic was entitled to indemnification from Ryan on account of Ryan's breach thereof:

> The shipowner here holds petitioner's uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of

the soundness of its manufactured product.

350 U.S. at 133–134, 76 S.Ct. at 237.

Subsequent decisions filled in the details of the nature and scope of the *Ryan* warranty. It was established that a stevedore's warranty to indemnify extends not only to its handling of cargo, as in *Ryan*, "but also to the use of equipment incidental thereto," Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491 (1958); that it runs not only to the shipowner, but to the ship as well, Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), regardless of whether the stevedore was engaged directly by the shipowner, by a time charterer, *Crumady*, or by the consignee of the ship's cargo, Waterman S. S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); and that it can be breached not only by negligently creating an unseaworthy condition, but by negligently bringing into play a pre-existing unseaworthy condition, *Crumady*, as well as by the non-negligent supplying of defective equipment. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). In *Italia*, the Court set forth the rationale for requiring indemnification in such situations—the same rationale that had prompted *Ryan*:

> Where the shipowner is liable to the employees of the stevedore company as well as its employees for failing to supply a vessel and equipment free of defects, regardless of negligence, we do not think it unfair or unwise to require the stevedore to indemnify the shipowner for damages sustained as a result of injury-producing defective equipment supplied by a stevedore in furtherance of its contractual obligations. [Citation omitted.]

**6.** The commentators are in agreement that *Ryan* was designed to meet this specialized need of shipowners. Stover, Longshoreman-Shipowner-Stevedore: The Circle of Liability, 61 Mich.L.Rev. 539, 562 (1963); White, A New Look at the Shipowner's Right-Over for Shipboard Injuries, 12 Stan.L.Rev. 717, 730 (1960); 44 Calif.L.Rev. 800, 804 (1956); 32 Geo.Wash.L.Rev. 893, 894 (1964); 6 N.Y.L.Forum 168, 185 (1960); 66 Yale L.J. 581, 584–85 (1957).

. . . [W]e deal here with a suit for indemnification based upon a maritime contract . . . in an area where rather special rules governing the obligations and liability of shipowners prevail, rules that are designed to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of such accidents. By placing the burden ultimately on the company whose default caused the injury [citation omitted], we think our decision today is in furtherance of these objectives.

376 U.S. at 324, 84 S.Ct. at 754.

This court has more than once recognized that it is the shipowner's strict liability for unseaworthiness that rests at the heart of *Ryan* indemnity. Schwartz v. Compagnie General Transatlantique, 405 F.2d 270, 276 (2d Cir. 1968) ("[A]ny equitable considerations underlying the decision of courts to require indemnity by applying the implied warranty of workmanlike service are ultimately derived from a shipowner's liabilities under the seaworthiness guarantee . . ."); DeGioia v. United States Lines Co., 304 F.2d 421, 425 (2d Cir. 1962) ("The primary source of the shipowner's right to indemnity, as a practical matter, is his nondelegable duty to provide a seaworthy ship . . .") *Accord*: Liberty Mutual Insurance Co. v. Fruehauf Corp., 472 F.2d 69, 70–71 (6th Cir. 1972); Barr v. Brezina Construction Co., 464 F.2d 1141, 1145 (10th Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973); Hobart v. Sohio Petroleum Co., 445 F.2d 435, 438 (5th Cir.), cert. denied, 404 U.S. 942, 92 S.Ct. 288, 30 L.Ed. 256 (1971).[7] A striking example of the application of this principle may be found in Davis v. Chas. Kurz & Co., 483 F.2d 184 (9th Cir. 1973). The shipowner's vessel was in a repair facility, and

not in navigation. The general contractor for repairs (Northwest) hired a subcontractor (Pacific), one of whose employees was injured on the ship. He sued the shipowner and Northwest, and Northwest impleaded Pacific, seeking indemnity. One who contracts to perform repairs on a ship is generally considered bound by the *Ryan* warranty, Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310 (2d Cir. 1958); here, however, the district court's findings that the vessel was a dead ship, and that the owner was therefore relieved of the duty to provide a seaworthy vessel, were not challenged on appeal. The Ninth Circuit held that *Ryan* was therefore inapplicable, because the shipowner's liability for unseaworthiness was removed from the case:

> The rationale underlying *Ryan* and the later cases is that when a shipowner owes a duty of seaworthiness to an injured party (and consequently its liability is not dependent on a finding of its fault) a corresponding duty of indemnity should devolve upon a stevedore whose failure to perform with reasonable safety caused the injury. [Citations omitted.]

Northwest argues that the existence of the warranty does not depend on a corresponding existence of a duty of seaworthiness. We think that it does. The circumstance which gives rise to the implied warranty is the duty of seaworthiness owed by the party seeking indemnification.

483 F.2d at 187.

Other decisions—including that of the district court in this case, 371 F.Supp. at 1194–1195—have rested *Ryan* on the elements of expertise, control, supervision and ability to prevent accidents: The shipowner, relying on the stevedore's expertise, entrusts loading

---

7. *Hobart* is one of a series of Fifth Circuit cases steadfastly refusing to extend *Ryan* indemnity to situations other than those involving a shipowner's liability for unseaworthiness. Smith Petroleum Service, Inc. v. Monsanto Chemical Co., 420 F.2d 1103, 1109 n. 9 (5th Cir. 1970); Loffland Brothers Co. v. Roberts, 386 F.2d 540, 549 (5th Cir. 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968); Centraal Stikstof Verkoopkanter, N. V. v. Walsh Stevedoring Co., 380 F.2d 523, 529 (5th Cir. 1967); Ocean Drilling & Exploration Co. v. Berry Brothers Oilfield Service, Inc., 377 F.2d 511, 513 (5th Cir.), cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (1967).

operations to its supervision and control, thereby putting the stevedore in the best position to prevent accidents. The same reasoning has been applied to "dead tows," Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055, 1058 (4th Cir. 1969); and ship repairs, H & H Ship Service Co. v. Weyerhaeuser Line, 382 F.2d 711, 712–713 (9th Cir. 1967). While these factors are certainly important, *Italia, supra,* 376 U.S. at 322–323, 84 S.Ct. 748, they omit the most significant aspect: the fact that the absolute duty of seaworthiness requires shipowners, regardless of their fault, to pay for accidents caused by stevedores. It is doubtful that *Ryan* would have been necessary were it not for *Sieracki*; the pre-*Ryan* situation would not have been so inequitable had the shipowner's liability to the longshoreman turned solely on a negligence standard, rather than on the absolute

seaworthiness standard imposed by *Sieracki*.[8] Therefore, we find the crucial elements of *Ryan* to be as follows: a shipowner,[9] relying on the expertise of another party (the contractor),[10] enters into a contract whereby the contractor agrees to perform services without supervision or control by the shipowner; the improper, unsafe or incompetent execution of such services would foreseeably render the vessel unseaworthy or bring into play a pre-existing unseaworthy condition; and the shipowner would thereby be exposed to liability regardless of fault. Where these elements are present, there will be implied in the contract an agreement by the contractor to indemnify the shipowner for any liability it might incur as a result of an unseaworthy condition caused or brought into play by the improper, unsafe or incompetent performance of the contractor.[11]

---

**8.** The 1972 amendments to the LHWCA, P.L. 92–576, 33 U.S.C. § 901 et seq., provide that shipowners can be held liable to longshoremen only for negligence, and not for unseaworthiness. By thus overruling *Sieracki*, the Congress intended to overrule indemnity to stevedores under *Ryan*. Travelers Insurance Co. v. United States, 493 F.2d 881, 885 n. 6 (3d Cir. 1974); Brock v. Coral Drilling, Inc., 477 F.2d 211, 213 n. 1 (5th Cir. 1973). This view is confirmed by the legislative history: "Since the vessel's liability is to be based on its own negligence, and the vessel will no longer be liable under the seaworthiness doctrine for injuries which are really the fault of the stevedore, there is no longer any necessity for permitting the vessel to recover the damages for which it is liable to the injured worker from the stevedore or other employer of the worker." H.R. 92–1441 (92d Cong., 2d Sess.), quoted at 1972 U.S.Code Cong. & Admin.News, pp. 4698, 4704.

**9.** This includes a time charterer, Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), or the consignee of the ship's cargo, Waterman S. S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960), or another in a similar position.

**10.** That *Ryan* no longer applies to stevedores and other employers covered by the LHWCA, see note 8, *supra,* does not necessarily mean that it is inapplicable to other contractors. *Ryan* has been held to apply to cases involving ship cleaning, H & H Ship Service Co. v. Weyerhaeuser Line, 382 F.2d 711 (9th Cir. 1967); ship painting, Mortensen v. A/S Glittre, 348 F.2d 383 (2d Cir. 1965); shipyard

services, American Export Lines v. Norfolk Shipbuilding & Drydock Corp., 336 F.2d 525 (4th Cir. 1964); towage services, Dunbar v. Henry DuBois' Sons Co., 275 F.2d 304 (2d Cir.), cert. denied, 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960); and repair work on a ship's engines, Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310 (2d Cir. 1958).

**11.** There is authority for applying *Ryan* to situations where the indemnitee's liability is predicated on some non-fault basis other than unseaworthiness. Cameco, Inc. v. S. S. "American Legion," 514 F.2d 1291 (2d Cir. Dec. 16, 1974) (carrier's liability to consignee under contract of carriage); United States v. Tug Manzanillo, 310 F.2d 220 (9th Cir. 1962) (shipowner's liability to seaman for maintenance and cure); James McWilliams Blue Line v. Esso Standard Oil Co., 245 F.2d 84 (2d Cir. 1957) (time charterer's vicarious liability to shipowner for negligence of third party to whom charterer entrusted vessel). In Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055 (4th Cir. 1969), however, *Ryan* was held applicable in a situation where the negligent bailee of a tow sought indemnity on its warranty from the tug (which could have acted to compensate for the other party's negligence). It may be that indemnity under *Ryan* should not be available to a party whose liability is based solely on negligence. The result in *Tebbs* might be justified, however, under a theory of last clear chance. See, Petition of Marina Mercante Nicaraguense, S. A., 364 F.2d 118, 124 (2d Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967); Petition of Kinsman Transit Co., 338 F.2d 708, 720 (2d Cir. 1964), cert. denied, 380

A standard essentially equivalent to that articulated here was applied in Hartnett v. Reiss Steamship Co., 421 F.2d 1011 (2d Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 49, 27 L.Ed.2d 90 (1970). That case involved the issue of whether the consignee of the cargo, which unloaded the cargo itself, could be held liable to indemnify the shipowner under *Ryan*. The consignee argued that, since it was merely accepting delivery of the cargo, it could not be held to the same standard of care applicable to a stevedore. This court rejected the argument, stating:

> We feel that the concept of stevedore should embrace anyone who by his acts can create—or avoid the creation of—those special risks which justify holding a stevedore to a warranty of super-carefulness to a ship, *whose own liability to injured workers approaches strict liability.*

421 F.2d at 1016 (emphasis added).

■■■ With this background in mind, it can be seen that the instant case is not really a *Ryan* case at all. The primary issue in *Ryan* was the indemnity problem, and the Court used the warranty of workmanlike performance as a vehicle on which to base the stevedore's liability to indemnify the shipowner. *Ryan's* recognition of the existence of a warranty of workmanlike performance in a maritime service contract was merely incidental to its particularized holding that the shipowner in the circumstances there presented was entitled to indemnity. Thus, the factors to be considered in de-

termining whether a contract includes a warranty of workmanlike performance are entirely separate from the factors that go into the determination of whether that warranty encompasses an obligation to indemnify. The arguments advanced by the parties here, as well as those relied on by the district court, are more properly directed to the latter issue. That, however, is not the issue in this case, which involves no indemnity problem. This case involves only the much simpler issue of whether Chevron's contract to provide tug assistance imposed on Chevron [12] an obligation to perform in a workmanlike manner. We perceive that as a simpler issue because in our view *Ryan*, by necessary implication, confirmed the applicability to maritime service contracts of the hornbook rule of contract law that one who contracts to provide services impliedly agrees to perform in a diligent and workmanlike manner. 9 S. Williston, Contracts § 1012C, at 38–39 (3d ed. Jaeger 1967). This obligation has been implied in contracts ranging from an ordinary construction contract, Henggeler v. Jindra, 191 Neb. 317, 214 N.W.2d 925 (1974), to a contract to install plumbing, In re Estate of Talbott, 184 Kan. 501, 337 P.2d 986 (1959), to a contract to tan goat skins, William Beadenkopf Co. v. Henwood & Nowak, Inc., 14 F.2d 125 (D.Mass.1926), and there is no reason why it should not be implied in maritime service contracts as well. Accordingly, we hold that there should be implied in Chevron's contract to provide tug assistance [13] an obligation to perform in a

U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965).

12. And upon Chevron's subcontractor or agent. Todd Shipyards Corp. v. Moran Towing & Transportation Co., 247 F.2d 626 (2d Cir. 1957).

13. More accurately, Chevron's contract was of a hybrid variety, for Chevron agreed to sell bunkers, a product, as well as to provide the accompanying services. This does not change the applicability to the service portion of the contract of the warranty of workmanlike performance, however. In cases involving warranties of fitness of goods, courts at one time based the applicability of the warranty on whether the contract was one to

provide goods or services, and in cases of hybrid contracts the characterization was likely to be result-oriented. Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954) (contract to provide hospital care held to be contract for services, not goods, and therefore hospital did not breach any implied warranty of fitness when it transfused hepatitis-contaminated blood into patient). The current trend, however, is to treat hybrids for what they are, applying the warranty of fitness to goods sold or provided in conjunction with services. Newmark v. Gimbels, Inc., 54 N.J. 585, 258 A.2d 697 (1969) (patron of beauty salon injured by solution applied while receiving permanent wave); Hoffman v. Misericordia Hospital of Philadel-

workmanlike manner—that is, a warranty of workmanlike performance.

## III. THE BREACH OF THE WARRANTY

The district court found that the stranding of the Western Eagle was caused by the late appearance of the tugs on the scene and by the failure of the tugs to make fast when directed to do so by Pennarts. Chevron claims that neither finding can support the holding that the warranty of workmanlike performance was breached: the former, because the tugs were under no duty to come out until called for by the pilot; the latter, because the tugs acted reasonably in order to avoid collision with the other traffic on the river. We need reach only the latter contention, however, because it does not appear that the finding of breach of warranty rested on the tugs' late arrival. The district court, relying on Pennarts' statement that "if the tugs had made fast, 'I was out of the trouble,'" 371 F.Supp. at 1196, specifically found that "[d]espite the tugs' late arrival . . . the accident could have been avoided if the tugs had made fast to the Western Eagle and assisted her in turning." *Id.* at 1197.[14] Thus, the crucial question in determining whether the warranty was breached is whether or not the tugs were justified in leaving the Western Eagle at the approach of the downriver coasters.

The testimony in this regard is inconclusive. On the one hand, the coasters no doubt did pass in close proximity to the Western Eagle, and Pennarts did state that he was fearful of a collision. On the other hand, it seems clear that there was a distance of 1800 feet between the Western Eagle and the northern bank of the Scheldt—ample room for the coasters to pass. It is uncontradicted that the coasters did in fact pass without incident. And it also seems to have been the case that the Frederik Hendrik was close enough to the Western Eagle to take a heaving line, but unfastened it at the approach of the second coaster. As for visibility, while there were some indications that the fog was dense, Pennarts stated that he could see lights on shore—one half mile away—when he boarded the Western Eagle.

If this were a case turning on a negligence standard, we might find it more difficult.[15] But a warranty of workmanlike performance may be breached by non-negligent as well as by negligent conduct. *Italia, supra,* 376 U.S. at 324, 84 S.Ct. 748. We are not prepared to hold that the district court's finding of breach under the conditions outlined above is clearly erroneous. Accordingly, we affirm the holding that the tugs breached their warranty of workmanlike performance.

Chevron presses on us one final argument: It claims that the Western Eagle's own conduct in putting herself in a position of danger under conditions of adverse visibility, wind and current should bar Fairmont from recovery. Again, if this were a negligence case, we might have more difficulty. But negligence alone will not bar a plaintiff from recovering for breach of warranty of workmanlike performance. "Merely concurrent fault is not enough"; there must be "active 'hindrance.'" Albanese v. N. V. Nederl. Amerik Stoomv. Maats., 346 F.2d 481, 484 (2d Cir.), rev'd on other grounds, 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327 (1965). There was no such

---

phia, 439 Pa. 501, 267 A.2d 867 (1970) (patient contracted illness from contaminated blood supplied by hospital).

14. The dissenting opinion states that the Sophia did in fact make fast after the coasters had passed, but the line parted. However, Schuiling, the Sophia's captain, stated that he first made fast at "exactly" 4:20 a. m. Since the Western Eagle went aground at 4:15, it would appear that, even if the Sophia did manage to make fast, she did so after the stranding, too late to be of assistance. The tow rope evidently parted because it was not strong enough to pull the Western Eagle off the dike.

15. Possibly a finding of negligence based on the abandonment of Western Eagle by the tugs under the circumstances would have been sustainable, but this is not before us.

hindrance here. Defendant's own expert testified that if, as Pennarts stated, visibility was half a mile at the time Pennarts boarded the Western Eagle, then the Western Eagle was "entitled to proceed." And even after the Western Eagle had gotten into trouble, she could have made it safely to port had the tugs not left her when Pennarts directed them to make fast. It can hardly be said that at that time the Western Eagle actively hindered the tugs from making fast. We therefore reject Chevron's contention that Fairmont should be barred from recovery by reason of the Western Eagle's own conduct.

In sum, we hold that the contract contained an implied warranty of workmanlike service, that the tugs breached the warranty, and that the Western Eagle did nothing to bar Fairmont's recovery. We therefore uphold the interlocutory order of the district court, and remand for an assessment of damages.[16]

Affirmed.

MANSFIELD, Circuit Judge (dissenting):

Judge Smith's thorough and scholarly analysis of the historical development of the *Ryan*-type warranty demonstrates that we are not here confronted with such an indemnity but with an implied obligation arising out of Chevron's contract to provide tug assistance. However, I do not agree with the majority's interpretation of the nature and extent of that implied obligation. Furthermore the proof is overwhelming that there was no breach of it.

Chevron did not contract to assume control over a dead ship. See, e. g., Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055 (4th Cir. 1969); Todd Shipyards Corp. v. Moran Towing & Transportation Co., 247 F.2d 626 (2d Cir. 1957); James McWilliams Blue Line, Inc. v. Esso Standard Oil Co., 245 F.2d 84 (2d Cir. 1957). It contracted merely to provide "ordinary tug assistance if required" to the Western Eagle as a live ship under its pilot's control. This is not, therefore, a case of the type referred to by the district judge where "[t]he shipowner turns his vessel over to the tug's control, depending on the latter's expertise in conducting safe towing operations." (App. 298a). Were control of the ship to be with Chevron, it might have insisted upon taking greater precautions than those observed by one rendering "assistance." Indeed the tugs hired by Chevron could justifiably have refused to accept control initially unless they were given ample advance opportunity to exercise control effectively, which was not the case here since there was a dense fog and the pilot did not ask for tug assistance until the ship had gone past Buitenhaven and was in danger. Were the tugs in control, they might have demanded that the Western Eagle drop anchor until they could navigate safely; or, in the alternative, they might have decided upon a different and safer course to pursue up the Scheldt River.

But control of the Western Eagle remained with the pilot and Chevron was not required to take these precautions. It bound itself merely to provide "ordinary tug assistance." Regardless whether that obligation is labelled a contractual promise or a warranty, it did not convert Chevron into an insurer against accidents, see Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932). Nor did it relieve the shipowner of responsibility for accidents occurring while the ship was within its control, The McCaldin Brothers, 213 F. 211 (2d Cir. 1914). The contract obligated the tugs to render such assistance as could

**16.** We have decided this case on the basis of United States law. The contract was entered into in New York, but the place of performance was The Netherlands. We have not considered whether choice of law rules would require application of Dutch law because, in view of the fact that neither party has sug- gested that the foreign law would differ from United States law, we are not required to conduct an independent investigation of foreign law. Fed.R.Civ.P. 44.1; Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 155 n. 3 (2d Cir.), cert. denied, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968).

*reasonably* be expected of them under all of the circumstances that might be confronted, see Stevens v. The White City, *supra,* including the position in which the vessel might place itself prior to calling for assistance and the possibility that if the tugs should, in the course of rendering assistance, be faced with imminent peril to themselves and their crews they could not reasonably be expected to destroy themselves. Faced with imminent peril to themselves or the ship, their contractual duty to assist would not preclude their exercise of reasonable discretion in determining whether to carry out dangerous orders from the pilot, see The Edward G. Murray, 278 F. 895 (2d Cir. 1922); cf. Esso Standard Oil, S. A. v. S. S. Gasbras Sul, 387 F.2d 573, 580 (2d Cir. 1967), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968). Surely these time-honored principles of reasonableness in construing the term "assistance" cannot be repealed or negated by invocation of the term "warranty" as if it were some sort of magical talisman, particularly when the policy reasons for the judicially created *Ryan*-type "warranty of workmanlike service" are not present. With the shipowner in command of the ship, the need for saddling the tugs with strict liability is certainly less than where they are in control. In my view a tug obligated to render "assistance" is held to no more than a standard of reasonable care in the rendition of that assistance, whether or not the obligation is labelled contractual or given the more exacting term "warranty."

Regardless whether Chevron's obligation rose to the level of a warranty, the proof was clearly insufficient to support a finding that Chevron breached its obligation. Since the key witnesses, the pilot of the ship (Pennarts) and the captains of the two tugs (Schuiling and Bout) testified by deposition, we are in as good a position as the trial judge to assess their testimony. The record reveals that the two tugs (the Sophia and the Frederik Hendrik) proceeded from port to assist the Western Eagle as soon as they were called upon to do so. However, this may well have been too late because, as both tug captains testified, it was dark, there was a "dense fog," with "visibility . . . [that] varied from thirty to forty meters," there was a strong flood tide and a force 5 to 6 wind sweeping the ship east and northward toward the rocky dike. The Hendrik, which was the first tug to arrive near the ship, went to the port side of the bow of the Western Eagle as directed by its pilot and was unsuccessful in picking up the ship's tow rope because the ship was going astern and moving away as the tug lay dead in the water. At that point, with the Hendrik under the ship's bow, the tug captain (Bout) saw the mast headlights of two coasters bearing down on his position from the eastward. The Western Eagle swung violently to the port. The Hendrik, fearing that one of the coasters would collide with it, then moved to the starboard side of the Western Eagle. The Hendrik's captain testified that "his first duty was to get himself into safety, when he saw that coaster."

In the meantime the tug Sophia arrived on the scene and, according to the testimony of her captain (Schuiling) found the ship "at a distance of about a hundred to one hundred fifty meters away from the coastline" upon which the ship was soon to strand. The captain further testified that as his tug was located about 30 meters from the stern of the Western Eagle he was instructed by its pilot to stand by so that he could make fast by tow line to the aft of the ship. At that point he observed two coasters coming down the river from the east, one on the right side of the channel and the other to the left, and "took for safety's sake a position amidships of the Western Eagle." The Western Eagle was going astern, located only a short distance from the north shore, and the first coaster passed 30 to 40 meters off its port bow toward the near shore. Immediately thereafter the second coaster also passed along the port side of the Western Eagle toward the north shore and only "a few meters" from its stern. The Sophia then picked up the Western

Eagle's tow rope and made fast to the ship but the line parted. More tow ropes were then picked up and made fast but by that time the Western Eagle was aground.

Thus, according to the testimony of the two tug captains, they had little or no time to make fast to the Western Eagle, one having been unable to pick up the tow rope near the bow and the other having been ordered by the pilot to stand by in readiness to pick up a tow rope near the stern, when they saw the two coasters bearing down on them and, apprehending a collision, moved to a safer position. As it was, the second coaster barely missed colliding with the Western Eagle.

That the tugs' apprehension of an imminent collision with the coasters was not unreasonable is attested to by the following testimony of the pilot of the Western Eagle:

"Q. Were you concerned about a collision with the second coaster, is that the reason you stopped your vessel? A. Yes. I wanted to give her room.

"Q. So that the second coaster was close enough that you were concerned about a possible collision and that is the reason you gave stop? A. Yes." (App. 63a).

The vessel's log contained the following entry:

"To avoid collision with two other vessels seaward bound we were obliged to perform full astern and whistled three short blasts." (Ex. I; App. 113a).

Since the tugs measured 36 meters long by 8 meters in the beam it appears that, if it had remained to the port of the Western Eagle, the Hendrik would probably have been struck by one of the two coasters, which passed only a short distance away on the same side of the Western Eagle.

Notwithstanding the foregoing, the district court found:

"Apparently, the tugs feared a collision with the coasters, which arrived on the scene as they were about to make fast. The testimony and written statements of Pennarts, however, who had the best vantage point to judge the situation, fail to show that he believed there was any danger that the tugs and coasters would collide. Rather, there was ample room between the WESTERN EAGLE and the northern shore for the coasters to pass, as they did, without incident." (App. 306a).

The proof, including the testimony of the pilot of the Western Eagle, however, shows that everyone, including the pilot, feared a collision. Furthermore, if the Western Eagle had been located 3 cables (i. e., approximately 1,800 feet) from the north shore, rather than 100 to 150 meters as Captain Schuiling testified, the tugs would undoubtedly have had ample time after the two coasters passed to make fast and start towing the ship southward.

In view of the foregoing undisputed evidence, the district court's finding that Chevron breached its obligation to render tug assistance was clearly erroneous.