Peter HARTNETT, Plaintiff-Appellee,

v.

The REISS STEAMSHIP COMPANY, a corporation, Defendant-Appellee,

and

INTERNATIONAL MILLING COMPANY, a corporation, Defendant-Appellant,

v.

GRAIN HANDLING COMPANY, Inc., a corporation, Third-Party Defendant-Appellant.

Nos. 193, 194, Dockets 33611, 33612.

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1969.

Decided Jan. 22, 1970.

Fenton F. Harrison, Buffalo, N. Y. (Harrison, Gruber & Gaughan, Buffalo, N. Y., on the brief), for defendant-appellant International Milling Co.

Evan E. James, Buffalo, N. Y. (Joseph M. Soviero, New York City, on the brief), for third party defendant-appellant Grain Handling Co.

Raymond J. McNamara, Buffalo, N. Y. (McNamara & Fitzhenry, Buffalo, N. Y., on the brief), for plaintiff-appellee Peter Hartnett.

Thomas O. Murphy, Cleveland, Ohio (Johnson, Branand & Jaeger, John T. Jaeger, Cleveland, Ohio, Phillips, Lytle, Hitchcock, Blaine & Huber, Robert M. Hitchcock, Buffalo, N. Y., on the brief), for defendant-appellee The Reiss Steamship Co.

Before MEDINA, MOORE and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Out of a simple accident in 1964 aboard the William A. Reiss has come an unusually complicated case. Injured in the accident was plaintiff Peter Hartnett, a longshoreman employed by Grain Handling Company, Inc. Plaintiff sued both The Reiss Steamship Company, the owner of the vessel, and International Milling Company, a company involved in

unloading the ship. Reiss impleaded plaintiff's employer, Grain Handling, as third-party defendant; Grain Handling and the two original defendants all made various claims against each other. The trial was held before John T. Curtin, J. and a jury in the United States District Court for the Western District of New York. In the first phase of the trial, plaintiff was awarded judgment against defendant Reiss for unseaworthiness and against defendant International for negligence in the sum of $17,424, representing plaintiff's damages diminished by his one per cent contributory negligence found by the jury. At this point, the trial judge proceeded to the various remaining claims. On claims for indemnity by shipowner Reiss, he found that International was a stevedore as a matter of law, but submitted to the jury the issue whether Reiss had prevented International from fulfilling its warranty to Reiss of workmanlike performance; the judge ruled as a matter of law that Reiss was entitled to indemnity from Grain Handling. He then also submitted to the jury the liability of Grain Handling and International to each other on their cross claims. The jury found Reiss entitled to be indemnified by International and found Grain Handling and International "jointly responsible" as between themselves.

Both plaintiff Hartnett and shipowner Reiss are apparently satisfied with the judgment below, since neither appeals. International and Grain Handling do appeal, however, and raise a number of contentions. We have considered them all; we affirm the judgment of the district court which held International and Grain Handling equally liable, on this record an obviously sensible result.

## I.

The William A. Reiss carried a cargo of grain for International from Duluth, Minnesota to Buffalo, New York. When the vessel arrived in Buffalo, it docked beside International's grain elevator, where the latter directed the location of the mooring and the opening of the hatches for the discharge of grain. The unloading was done initially by use of a mechanical "leg," essentially a series of buckets on an endless belt which scoop up the grain; the leg was lowered from the elevator into the grain in the hold and carried the grain into a tower. An International employee, called a leg man, supervised the unloading operation into the tower from aboard the vessel. When the grain in the hold reached too low a level, it became necessary to send other men, called scoopers, into the hold to move the grain by use of mechanical shoveling equipment to within the reach of the mechanical leg. The scoopers, including plaintiff, were longshoremen employed by Grain Handling. Evidently, the custom of the port is that Grain Handling supplies the men on a portwide basis, and the elevator (in this case, International) supplies the machinery and equipment necessary for this task at the site.

The accident to plaintiff occurred on the morning of November 26, 1964. On the previous day during a heavy rain, Grain Handling scoopers had emptied all but one corner of the hold where the accident occurred. When the scoopers left the hold, it was necessary to use a small portable ladder to get to the ship's starboard bulkhead ladder, which, like its counterpart on the port side, ended some distance above the deck of the hold. The next morning International made the decision to continue the unloading despite the rainfall, which apparently was continuing. Grain Handling's gang boss, whose job included inspecting the ship for unsafe conditions, did not go aboard the vessel that morning. Plaintiff was the first employee to enter the hold. Receiving no instructions to the contrary, and evidently forgetting the location of the portable ladder, he descended the port side bulkhead ladder, lost his footing on the last rung, fell into a puddle of grain and water, attempted to rise and fell again, and thus sustained the injuries in suit.

## II. CLAIMS OF INTERNATIONAL

Appellants International and Grain Handling advance a number of claims, some addressed to their liability vis-à-vis plaintiff or the ship, and some addressed to the judgment holding them equally liable. We deal with the claims of International first.

### Claims relating to plaintiff

As already indicated, the issues in the case were sensibly decided in two steps. The first step resulted in a verdict for plaintiff against the vessel for unseaworthiness and against International for negligence.[1] International claims that (1) since it had no responsibility for the absence of a portable ladder at the foot of the bulkhead ladder, it was error to instruct the jury that this was a possible basis of negligence; (2) plaintiff failed to prove that it was negligence to unload in the rain; (3) even if it was, plaintiff failed to prove that his accident was proximately caused thereby; and (4) plaintiff suffered no real loss of wages because of money he received from a wage pool explained below.

As to International's first contention, the jury could have concluded from the evidence before it that International's employees waited for the vessel on the dock, directed its mooring, furnished the mechanical conveyors, all of the power and equipment, including the misplaced portable ladder, directed the opening and closing of the vessel's hatches and the movement of the vessel along the elevator dock, and generally—with labor furnished by Grain Handling for work in the hold—supervised the unloading of the vessel. Under those circumstances, the jury could properly find that a substantial share of the responsibility for the absence of the ladder belonged to International.

As to contention (2), International concedes that a jury could properly hold it responsible for unloading in the rain but argues that there was no proof that this was negligent, and that the court neither defined negligence nor explained plaintiff's burden of proof. These claims are simply not borne out by the record. The judge did define negligence and did set forth plaintiff's burden. In addition, there was evidence that on the morning of the accident it was raining, that the vessel's mate and International's deck boss discussed whether the hatches should be opened for unloading during the rain, and that International said to go ahead. The jury could have inferred from this that unloading in the rain, in these circumstances, was sufficiently risky so that it was necessary to consider the question, but that International went ahead despite the risk. We cannot say that as a matter of law this was not negligent.

International's contention (3) is that it was not reasonably foreseeable that rain water would accumulate in the hold, that neither plaintiff's employer, Grain Handling, nor the vessel would inspect the hold or correct the condition, as they allegedly should have, and that plaintiff would descend and break his leg as he did. While International cites impressive precedents, e. g., Palsgraf v. Long Island Ry., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928), they are inapposite. It seems clear that plaintiff was within the zone of danger caused by unloading the ship in the rain; there is nothing here so bizarre as the events leading up to the injury as Palsgraf. If unloading in the rain was negligent at all, as the jury was entitled to conclude it was, then it was negligent with respect to the longshoremen working in the hold, since that would be one of the logical places where sloppy conditions or an accumulation of water might be expected. Moreover, once International negligently created the dangerous condition in the hold, it ought to have foreseen the type of accident that did occur. The negligent failure of other persons to correct the dangerous condition was not

---

1. The trial judge dismissed a negligence claim against the ship and an unseaworthiness claim against International.

sufficient to insulate International's negligence from being the proximate cause of plaintiff's injury, particularly since the continuation of the dangerous condition was due as much to International's failure to inspect the hold as to Grain Handling's.[2]

 International's argument (4) is that plaintiff suffered no damage from loss of wages because he received payment from a wage pool, which apparently operated as follows: The employees of Grain Handling were paid on a per-ship basis, rather than on an hourly or individual piece-work system, the total payment being divided among the employees on a particular crew; if a member of a crew became incapacitated through injury, he continued to receive his wages from the pool, and the other members of the team took up the slack and unloaded the ship with fewer men. International's argument is based on the assumption that New York law, and in particular Drinkwater v. Dinsmore, 80 N.Y. 390 (1880), governs this case. Apart from the question whether in this action in admiralty for maritime tort New York law would be relevant, cf. Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953),[3] the *Drinkwater* rule itself is applicable today only to gratuitous payments, not to those which arise out of contract, such as insurance. See Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 316–317 (2d Cir. 1964). The arrangement here was essentially a form of insurance contract, albeit an informal one; we see no reason why it should be accorded different treatment from more formal arrangements.

*International's other claims*

 International also raises several questions concerning its liability to the ship for breach of warranty of workmanlike performance. First, International claims that the trial judge erred in holding it to be a stevedore as a matter of law. Its argument stems from its dual capacity. It owns and operates the Lake and Rail Elevator, but it is also a flour milling concern and, as such, was the owner, shipper, and consignee of the cargo being unloaded. International contends that by means of its mechanical leg, it was merely accepting delivery of the cargo in its latter capacity, and was not engaged in unloading the ship with the Elevator's mechanical equipment. The argument does not persuade us. We feel that the concept of stevedore should embrace anyone who by his acts can create—or avoid the creation of—those special risks which justify holding a stevedore to a warranty of super-carefulness to a ship, whose own liability to injured workers approaches strict liability. International was engaged in operating unloading machinery—the leg—inside the hold of the ship; more importantly, in order to operate the machinery it was necessarily in partial control of the ship. These actions carried with it a concomitant duty to exercise that control so as to protect the ship and those who must be exposed to the hazards of the work. In other words, it is the act of unloading—and International cannot deny that it was engaged in moving grain from the hold onto land—rather than either the means of unloading or the ownership of the grain that is crucial to a determination whether the person doing the act is a "stevedore." For the same reason, in the absence of an express contractual

2. In connection with all of the foregoing complaints of International about liability for its own negligence, it should be pointed out that in this court no one challenges the jury finding that the William A. Reiss was unseaworthy. Given this, International is also liable as an indemnitor, as more fully discussed below.

3. The general rule in the federal courts is that the collateral source rule is applied and defendants cannot show payments of this kind in mitigation. See Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 4 A.L.R.3d 517 (9th Cir. 1962).

provision shifting responsibility for the conduct of the unloading, it is irrelevant whether Reiss initially contracted with International to unload the grain and subsequently paid International to do so or whether the contract rate for carriage of the grain, as initially set, assumed that International would unload the grain. It is the act of unloading and the fact that International undertook to do this for the ship which determines whether a warranty of workmanlike performance should be implied in the contract between them.

International also complains of the dismissal of its cross-claim against Reiss. However, since International was properly held to be a stevedore, the dismissal was correct. A shipowner's recovery from a stevedore for breach of warranty is not affected even by the ship's own negligence, unless the ship prevented or seriously hampered the stevedore in performing its warranty of workmanlike service, which the jury quite properly found did not occur. See Weyerhaeuser S. S. Co. v. Nacirema, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958).

International's final claim is based on the fact that it did its "stevedoring" in conjunction with Grain Handling, admittedly a stevedore. Thus, International argues that it is the third-party beneficiary of Grain Handling's warranty of workmanlike service to Reiss, upon the principles we set forth in Williams v. Pennsylvania R. R., 313 F.2d 203 (2d Cir. 1963). In that case, Wm. Spencer & Son Corporation had been engaged by the Lehigh Valley Railroad to unload a Lehigh barge. The Lehigh had also obtained a floating crane and its operator from the Pennsylvania Railroad Company to be used in the unloading under Spencer's direction. The negligent operation of the crane under the general supervision of Spencer caused an injury to one of Spencer's employees, John H. Williams, while he was unloading the barge. Williams sued the Pennsylvania and recovered $2,500. The Pennsylvania asserted a third-party claim against Spencer, which we upheld. International claims that the activities of the Pennsylvania and Spencer in that case resemble those of International and Grain Handling here, so that International should, like the Pennsylvania, get the benefit of a warranty by a stevedore (Grain Handling) to the vessel. But the unloading operation in *Williams* was controlled by Spencer and was not under the overall direction of the Pennsylvania. Here supervision of the unloading was in the hands of International, at least in substantial part. Under the circumstances, we do not think it appropriate here to extend the warranty to a vessel of one stevedore (Grain Handling) to benefit a co-stevedore (International). Moreover, if International was the beneficiary of such a warranty, then Grain Handling was equally the beneficiary of a warranty from International, which was also breached. While this might in fact be a way of resolving the liabilities of Grain Handling and International between themselves, we prefer to do so on another ground, to which we shall return.

### III. CLAIMS OF GRAIN HANDLING

We turn now to the arguments of Grain Handling, which presses two claims regarding the judgment in favor of plaintiff Hartnett. The first is the impropriety of allowing plaintiff loss of wages; we have already disposed of that contention. The second is that the finding that plaintiff was only one per cent contributorily negligent was against the weight of the evidence. This claim is also without any merit. On these facts, it was within the province of the jury to find that Hartnett's fault was minor in the extreme.

Grain Handling next argues that it should have been allowed to submit to the jury its claim that it did not breach its warranty to the vessel. Grain Handling relies on International Terminal Operating Co. v. N. V. Nederl. Amerk. Stoomv. Maats., 393 U.S. 74, 89 S.Ct. 53, 21 L.Ed.2d 58 (1968). In that

case, this court reversed a jury verdict holding a stevedore blameless, and held the stevedore's conduct unreasonable as a matter of law. 392 F.2d 763. The Supreme Court reversed and held that the issue was for the jury under the Seventh Amendment. The trial judge in this case granted Reiss indemnity from Grain Handling as a matter of law. Reiss argues to us that this was correct because the jury's finding that Hartnett had been contributorily negligent was conclusive as to his employer's breach of warranty. Although there was ample other evidence from which a jury could have found a breach of warranty by Grain Handling, there was nothing other than Hartnett's contributory negligence which we would say was a breach as a matter of law.

We believe that disposition of this point is controlled by our recent decision in McLaughlin v. Trelleborgs Angfartygs A/B, 408 F.2d 1334 (2d Cir.), cert. denied, Galten Marine Co. v. Trelleborgs Angfartygs, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 464 (1969). We there held that a stevedore warranted employees who would in fact not be negligent, and thus that a jury finding that a stevedore's employee (the plaintiff) was contributorily negligent conclusively determined the stevedore's breach of warranty. We pointed out that unlike the situation in *International Terminal Operating Co., supra,* we were implementing rather than disturbing the jury verdict. We also distinguished an earlier line of cases in this circuit, typified by Calderola v. Cunard S. S. Co., 279 F.2d 475 (2d Cir.), cert. denied, 364 U. S. 884, 81 S.Ct. 172, 5 L.Ed.2d 104 (1960), and Orlando v. Prudential S. S. Co., 313 F.2d 822 (2d Cir. 1963), both of which are relied on by Grain Handling here.

The argument was made in *McLaughlin* that mechanical application of the rules of indemnity led there to an ir-

rational result. At first blush, the same claim might be made here; it does seem strange that conduct by a Grain Handling employee which deviated only minimally (1%) from the norm should subject his employer to potentially full liability. To this argument, it might be enough to recall that the eccentricities of the law in this area were explored thoroughly in *McLaughlin,* where we concluded that attempts to make it more rational should be left to the Supreme Court or Congress. 408 F.2d at 1338. But it is more satisfying to point out that the end result here is perfectly rational, even if some of the intermediate steps seem arbitrary. Grain Handling was not an innocent bystander suddenly saddled with immense liability because of a peccadillo by its employee, plaintiff Hartnett. There was testimony indicating that Grain Handling was at the very least jointly responsible for the correct placing of the ladder in the hold, that another of its employees, gang boss McLaughlin, was supposed to inspect the hold for unsafe conditions and that he did not even go aboard the *Reiss* the morning of the accident.[4] However tempted we might otherwise be to reexamine the implications of a finding of contributory negligence in such a minor degree, we find it easy to resist the temptation here.

This brings us to the last of Grain Handling's arguments. The final decree below, on the basis of a jury finding of joint responsibility, divided the ultimate liability for the amount of plaintiff Hartnett's recovery equally between Grain Handling and International. Grain Handling contends that it should be liable only for 25, not 50, per cent of plaintiff's recovery, because Reiss and International, as original defendants, were both independently liable to plaintiff and because Grain Handling's obligation is only to bear equally with International the burden of satisfying Reiss.

---

4. Grain Handling argues that it had no obligation to inspect. The issue was not submitted to the jury, but on these facts, where the unloading operation had started the day before, Grain Handling's position would not seem persuasive.

Grain Handling's mathematics is impeccable; one-half of one-half is indeed one-fourth. But we think that what the trial judge did was correct. The apportionment that Grain Handling seeks would occur only through the vagaries of enforcement of judgments, which could also produce results even more unfair to the parties—for example, International, as an original defendant, might bear the full brunt of plaintiff's judgment if he proceeded against it for the entire amount in the first instance. But the trial judge here submitted to the jury the question of the responsibility of Grain Handling and International to each other, and the jury found them jointly responsible. It was correct to implement this finding by decreeing that each should bear half of the ultimate liability.

Accordingly, we affirm the judgment below in all respects.