**In the Matter of the Complaint of DELPHINUS MARITIMA, S.A., as Owner of the M.V. MARI BOEING, Plaintiff, for Exoneration from or Limitation of Liability.**

79 Civ. 2496 (CBM), 79 Civ. 3826, 79 Civ. 6798, 79 Civ. 6388, 79 Civ. 4061, 79 Civ. 3460, 79 Civ. 6685, 79 Civ. 4031, 79 Civ. 6790, 79 Civ. 6964 and 80 Civ. 0338.

United States District Court,
S. D. New York.

Feb. 9, 1981.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

These are eleven consolidated non-jury admiralty actions brought under Rule 9(h) of the Federal Rules of Civil Procedure in which the issue of damages is deferred until the questions of liability and limitation of liability have been first determined. The actions arise out of the stranding of the Mari Boeing off the northern coast of Bermuda on December 27, 1978. This court's jurisdiction has been invoked pursuant to 46 U.S.C. § 183 et seq. and 28 U.S.C. § 1333.

Delphinus Maritima, S.A., the vessel owner, filed its complaint for exoneration from or limitation of liability in 79 Civ. 2496. In that action, five claims were filed on behalf of various cargo interests. A claim was also filed in that action against the vessel owner on behalf of the charterer of the vessel, Atlanta Shipping Corporation (Atlanta), for its damages and for contribution or indemnity. A claim was also filed in that action against the vessel owner on behalf of Tidewater Stevedoring Company, the stevedore, for indemnity. The vessel owner counterclaimed against both the charterer and the stevedore for all losses sustained by the owner and for indemnity. Cross-claims were then made by all cargo claimants against the stevedore for all damages sustained by the cargo interests. The vessel owner impleaded National Cargo Bureau (NCB) for all losses incurred by the vessel owner and for indemnity.

In five separate actions, 79 Civ. 3460, 79 Civ. 3826, 79 Civ. 4031, 79 Civ. 4061 and 79 Civ. 6964, cargo claimants brought suit for their damages against Maritime Transport Overseas Inc. (MTO) and against the charterer, Atlanta, as the alleged operators and or charterers of the Mari Boeing and against the stevedore. In these actions, the charterer and MTO cross-claimed against the stevedore for contribution or indemnity. The stevedore then cross-claimed against the charterer and MTO for indemnity. MTO then impleaded the salvor, Smit International Ocean Towage and Salvage Company, (Smit). Smit counterclaimed against all cargo plaintiffs, except the United States, and filed a fourth party complaint against the vessel owner for indemnity. The third party complaint against Smit was subsequently dismissed and Smit is no longer a party to this action.

In five more actions, 79 Civ. 6388, 79 Civ. 6685, 79 Civ. 6798, 79 Civ. 6790 and 80 Civ. 0338, the cargo claimants brought suit for their damages against Intermarine, Incorporated, as the alleged managers of the Mari Boeing. Thus the parties to this action are:

1. Delphinus Maritima, S.A., a corporation which at all relevant times was and is the owner of the M.V. Mari Boeing.

2. Atlanta Shipping Corporation, a corporation which at all relevant times was the charterer of the Mari Boeing as set forth in a certain charter party under which the Mari Boeing was then operating.

3. Tidewater Stevedoring Company, a corporation which performed stevedoring functions with regard to the Mari Boeing while at Newport News, Virginia.

4. National Cargo Bureau is a non-profit corporation which inspected the cargo aboard the Mari Boeing when the vessel was in Newport News, Virginia, for the owner.

5. The Lummis Company and other plaintiffs listed in 79 Civ. 3460 are corporations or organizations which own or were the underwriters or subrogated underwriters of certain cargo on board the Mari Boeing.

6. The United States of America (79 Civ. 6685) is a sovereign party which was a shipper of certain cargo aboard the M.V. Mari Boeing. Todd Logistics, Incorporated, brought the action as agent for the United States and on behalf of the owners of the said cargo.

7. Petrolleo Brasileiro, S.A. (Petrobas) and Petrobas International, S.A. (Braspetro) (79 Civ. 4031 and 80 Civ. 3725) are corporations or organizations which were the owners or underwriters or subrogated underwriters of certain cargo onboard the vessel.

8. Agricultural Combinat PKB and Kannal DTD (79 Civ. 4061) are corporations which were the owners of certain cargo onboard the Mari Boeing.

9. Atco International, Limited, and the other plaintiffs listed in 79 Civ. 3826 are corporations or organizations which are the owners or were the underwriters or subrogated underwriters of certain cargo onboard the Mari Boeing.

10. Maritime Transport Overseas, Incorporated (MTO) is a corporation which acted as the agent for the charterer.

11. Intermarine, Incorporated, is a corporation which is named as sub-agent for the vessel owner in an agreement dated January 15, 1976 between Intermarine, Incorporated and Overseas Maritime, Limited.

The parties to this action stipulated to the following facts prior to trial:

(1) The Mari Boeing is a general cargo ship built in 1975. It has an overall length of 161.85 meters (531.02 feet). It has a breadth of 22.84 meters (73.1 feet). It has a gross tonnage of 13,456.53 long tons and a dead weight capacity of 21,192 metric tons.

(2) At all relevant times the Mari Boeing was operated pursuant to terms of a charter party dated December 1, 1978 wherein Delphinus Maritima, S.A., was listed as the owner and Atlanta Shipping Corporation as the named charterer.

(3) During the voyage, which is the subject of this law suit, the Mari Boeing loaded cargo at the following ports:

(a) December 4–10, Houston, Texas.

(b) December 16, Baltimore, Maryland.

(c) December 18, New York, New York.

(d) December 20–23, Newport News, Virginia.

(4) Cargo claimants were the owners or duly authorized representatives of the owners or underwriters or subrogated underwriters of cargo onboard the Mari Boeing for which bills of lading were issued. The parties agreed prior to trial that the bills of lading would be admitted evidence, and further agreed that at least some damage was sustained for each shipment.

(5) Newport News, Virginia was the vessel's last loading port and at 2248 hours on December 23, 1978, the vessel set sail from Newport News, Virginia destined for ports in the Middle East.

(6) The deck log records that on December 25, 1978 some of the deck cargo on board the vessel was seen to move.

(7) On December 26, the vessel altered course and went to Bermuda in order to work on the cargo on the deck of the vessel.

(8) On December 27, 1978, at 0453, the vessel went hard aground on a coral reef off the northern coast of Bermuda.

(9) The vessel remained aground until on or about February 26, 1979 before finally being refloated by professional salvors under a Lloyd's Open Form No Cure No Pay Salvage agreement and was taken into port in Bermuda.

(10) During the time when the vessel was aground the voyage was terminated. All available cargo was salvaged and discharged from the vessel at Bermuda where the owners of said cargo took possession of their cargo.

(11) Subsequent to the grounding, the vessel owner declared a General Average.

The consolidated trial on the issue of liability established the following additional facts:

The Mari Boeing is a Liberian flag vessel owned by Delphinus Maritima, a Liberian corporation. The vessel has five cargo holds and five hatches on the weather deck. The master, officers and crew of the vessel were all Republic of China (Taiwan) Nationals.

Overseas Maritime Limited (Ossmarine) and Intermarine, Incorporated (Bermuda and New York corporations respectively) were the agents of the vessel owner and of the vessel. These two corporations had broad general management duties and authorities with respect to the manning, equipping, operating and supervision of the vessel, its personnel and cargo carrying activities. Intermarine's principal place of business was in New York where it shares office space with Ossmarine. Ossmarine also has offices in Tokyo and Bermuda.

MTO is a Texas corporation and is the general agent of Atlanta Management Corporation. The latter are general managers for Atlanta and acted as agent of Atlanta, the charterer, with respect to the voyage here.

Tidewater was the stevedoring company which had been selected and paid by MTO to load the vessel's cargo at Newport News, Virginia. The National Cargo Bureau was also retained by MTO to inspect the propriety of the loading, stowing and securing of cargo at several of the vessels loading ports, including Newport News, Virginia.

The charter party between the vessel owner and Atlanta was dated December 1, 1978 and was on the New York Produce Exchange form with certain amendments. Paragraph 8, as amended, provided:

"8. That the Captain shall prosecute his voyage with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim and discharge the cargo at their expense under the supervision and responsibility as to vessel's seaworthiness of the Captain."

The Mari Boeing was delivered by the owner to Atlanta and MTO at Houston on December 3, 1978. The main office of MTO was in Houston but it also had offices in New York. On December 1, on the way to Houston, the vessel sent a message to MTO at Houston advising that it did not have a large scale harbor chart for Houston. The master wanted such a chart in order to proceed safely to the pilot station at Galveston. He believed there was some shallow water close to Galveston. The master expected that a harbor chart would be sent to him, however, the chart was not sent.

Atlanta and MTO had booked and had agreed to carry cargo of various shippers from United States to Middle East ports. This cargo, often referred to as project cargo, was to consist of very large units or pieces. MTO and Atlanta intended to have some of the cargo stowed and carried on the deck of the Mari Boeing.

The evidence disclosed at the hearing on liability that the master, the chief mate, the deck officers and deck personnel of the Mari Boeing were only marginally competent with respect to the loading and stowing of deck cargo. The master had been on board the Mari Boeing only since August 8, 1978. Since that time no cargo had been stowed or carried on deck. He had only sailed on vessels carrying deck cargo, in any capacity, on five or six occasions and had never made a North Atlantic crossing on a vessel with deck cargo. The second mate had never been on a vessel that carried the size and quantity of deck cargo that the Mari Boeing carried on its deck when it left Newport News, Virginia. The chief mate of the vessel had no valid marine license, although (since this was a general cargo vessel) he was the cargo officer. He had obtained his Liberian chief mate's license with a fraudulent Republic of China (Taiwan) license. He had been elevated from second mate to act as chief mate of the Mari Boeing in August 1978. He had never

acted as chief mate prior to that time. He had never been chief mate on a vessel that carried deck cargo; moreover, he had never seen cargo stowed as high as it was stowed on the deck of the Mari Boeing.

The evidence at trial disclosed that when the vessel left Newport News, the GM (metacentric height) of the vessel had not been calculated and the ship was very "stiff". The master and the chief mate were not particularly competent with respect to matters relating to the stability of the vessel. They were unfamiliar with the GM and stability characteristics and requirements of the vessel. More particularly, they were incapable of making the required stability calculations of the ship. The master was the only one on board the vessel who had any ability to read, speak or understand the English language, and his command of the English language was admittedly limited. The navigational publications, stability publications, general instructions and cargo instructions of the vessel were all in English as were the instruction manual for navigational equipment.

Booking notes and agreements covering the goods of cargo claimants were made between the various shippers and MTO and Atlanta. All bills of lading covering the cargo were issued by or on behalf of MTO and Atlanta. None was signed by the master. There was no contract of carriage between cargo claimants and Delphinus Maritima, the vessel owner. However, Delphinus Maritima was the employer of the master, officers and crew of the Mari Boeing.

The final identity, quantity and configuration of the cargo to be stowed on deck for the winter North-Atlantic crossing at issue here which the Mari Boeing was to make was determined on December 23, 1978. This was the last day of loading at Newport News. It was also the last working day in the Newport News Port before the Christmas holiday weekend of that year. Captain Heiner Popp, a Port Captain, had been hired by MTO and Atlanta to attend to and to supervise the loading and stowing of the vessel's cargo and the stability of the vessel

at the United States East Coast loading ports, including Newport News. A different port captain had attended and supervised at Houston on behalf of MTO and Atlanta. As noted above, NCB was also retained by MTO and Atlanta to inspect the propriety of the loading, stowing and securing of the cargo at the loading ports, including Newport News. Also, the vessel owner and its protection and indemnity underwriters had a surveyor representative, Alan Fife, to attend at Newport News on their behalf and to protect their interests. His duties included inspection of the vessel for the propriety of the loading and stowage of the vessel's cargo, especially its large deck cargo. Popp testified on the trial that the master of the vessel was also to supervise the loading, stowing and securing of the vessel's cargo and the stability of the vessel for the voyage.

Atlanta and MTO had overbooked the Mari Boeing with cargo. At Newport News, some of the cargo that Popp had originally wanted stowed below deck had to be stowed on top of the weather deck. MTO's intention was to have 402 tons of cargo stowed on the deck. Ultimately about 853 long tons of cargo were stowed on deck. Although the vessel had on board only 4,160 long tons of cargo, cargo was stowed in every available space on the deck including the hatch covers. Much cargo that Popp had wanted to get on board did not get loaded mainly because of the large size of the pieces of the cargo, the insufficient use of below deck space, and the rush to get the vessel out of Newport News before the start of the long holiday weekend. The CIF value of all cargo loaded on board the Mari Boeing was about $15,750,-000. The vessel was insured for $14,500,-000.

The problem in this case began with the loading of large pieces of cargo on the hatch covers on the deck at Newport News, Virginia, the last loading port before the vessel sailed on December 23, 1978, about one hour before midnight. Everyone involved in the loading operation, except the vessel's crew, was anxious to finish early

because of the upcoming Christmas weekend. The need to load large, bulky cargo on deck presented many problems.

Four large mobile cranes with rubber tires were placed on the number 1 hatch cover in an athwarthship direction at Newport News. A fifth crane was secured on deck in front of the No. 1 hatch. Captain Popp, the man who had been hired by MTO to supervise, direct and coordinate the loading at all East Coast ports, had intended to stow the cranes in a fore and aft position on the hatchcovers to reduce the effect on the cranes of the vessel's natural rolling from side to side. Popp had requested that the stevedore stow the cranes fore and aft. However, the loading equipment of the vessel at the No. 1 hold was deemed incapable of such placement. The cranes, therefore, could not be loaded in the fore and aft position. When it was determined that all four cranes could not be loaded on the hatch cover, if they were to be stowed fore and aft, the cranes were loaded athwarthship by the stevedore after discussion with Popp and with the express direction of Popp. This discussion took place with Popp at his home in Baltimore. Popp had left early on the afternoon of December 23, 1978, in order not to miss his plane reservation to Baltimore. Because of the Christmas Holiday weekend, Popp could not get a later reservation. Popp, therefore, left the loading operation before the large pieces of cargo had been loaded on the hatch covers. He left word that he could be reached at home in Baltimore if any problems developed. Problems did develop. The discussion regarding placement of the cranes on the No. 1 hatch cover and other problems with respect to the other hatch covers, included the master of the vessel and the vessel's representative, Mr. Alan Fife.

Insufficient wire lashings were also used on the cargo since the lasher ran out of chain. Popp advised that wire could be used. Moreover, the high wheels on the cranes which had been loaded on the hatch cover were not properly chocked and cribbed with sufficiently strong lumber to keep them secured in place. These cranes were among the deck cargo which shifted on December 26. Some of the cargo which was stowed below deck, particularly cargo in the No. 1 tween deck, just below the No. 1 hatch cover, was also not cribbed properly and was later discovered to have shifted when that hold was opened up after the grounding.

Large sections of prefabricated houses, 35 to 40 feet in length, were ultimately stowed on top of hatch covers after being stowed on three tiers of partially enclosed wooden crates of cold water pipe. Each of the pipes was about 42 feet in length and several pipes had been placed within each crate. The pipes within each crate had been secured with small triangular shaped wooden chocks to keep the pipes from rolling. Manifestly, the pipes had been crated to facilitate loading and unloading. It was obvious from the photographs in evidence, even to a layman, that the wooden crates which housed the pipes had not been intended to act as a platform on which to stow other heavy cargo without further securing the pipes in such a fashion that they could not move. The crates of pipe were first loaded on the No. 2, 3 and 4 hatch covers three tiers high. These crates were then banded together with wire lashings to keep the crates from moving. The prefabricated houses were then placed on the crates of pipe and then chain lashed to the decks. The intention had been for the houses to be stowed one high directly on the hatch covers for the voyage. The houses had been loaded and stowed directly on the hatch covers in Houston but had to be unloaded at Newport News in order to first accommodate the cold water pipes. The crated pipes were placed on the hatch covers at Newport News, as described, and the houses were then reloaded and stowed on top of the crated pipes. Chain lashings with binders were used on the houses. Wire lashings with turnbuckles were used on the crated pipe. The houses settled on the crates of pipe after the vessel left Newport News. This settling together with the wire banding caused the wooden crates and the pipes to rack. The racking, in turn, caused the wires around the crated pipes to cut into

the wood of which the crates had been made. The houses and the pipes were among the deck cargo which shifted on December 26, 1978.

The stevedore's employees had unloosened wire lashing which secured cargo on the deck and on the hatch covers to facilitate their walking fore and aft the deck. The stevedore, on the trial, failed to establish, by a fair preponderance of the credible evidence, that these lashings had all been resecured by the longshoremen as claimed before leaving the vessel. The vessel owner, likewise, failed to prove, by a fair preponderance of the credible evidence, that the ship's crew resecured all of these lashings before or after leaving Newport News. It is undisputed that these lashings were loose when the cargo shifted on December 26, 1978. The vessel encountered a storm, after leaving, on December 26, 1978. Because of the bad weather, the crowded conditions on the deck, the lack of a catwalk, and the fact that the cargo on the hatch covers had shifted, the crew was not able to resecure the lashings at sea.

As the master of the vessel then advised the owners, the crew became fearful for their safety and their lives and sought permission to deviate to Bermuda in order to resecure the cargo on the deck.

Permission was granted by the owner to go to Bermuda. However, problems developed because there was no large scale map of Bermuda on board the vessel and the master failed to consult the Sailing Directions which were on board. A large scale map and the Sailing Directions, if consulted by the master (the only one on board who could read English), would have revealed the coral reef which extended ten miles out to sea off the northwest coast of Bermuda. The master was unaware of the extent of the reef and, consequently, the vessel went hard aground on the reef causing damage to the vessel and the cargo on board the vessel.

Before the vessel left port, Alan Fife, the owner's representative, made a note of several problems which had to be corrected if the cargo stowed on deck was to be secured

and properly stowed. One thing which he noted was that the hatch cover at the No. 1 hatch had not been completely closed. He hurriedly made note of this and other problems on a scrap of paper when the master insisted on leaving port as directed by Popp and asked the master to sign it. He later wrote a letter to the owners and charterers making his objections more explicit for the record. The note and letter were required because Fife could not reach the owner's agents, Intermarine, by telephone before the vessel sailed to advise them of these matters. Although Popp was advised of the problems, including the necessity for a catwalk to be built on deck so the crew members could go fore and aft the vessel without stumbling over wires, Popp insisted that the vessel leave that night as scheduled.

The NCB surveyor at Newport News refused to issue a certificate of loading, as requested by the vessel owners, because of the condition of the cargo and notified Fife when he could not reach any other owner representative. This was NCB's only function at the loading. NCB's motion to dismiss the vessel owner's claim for damages against it and for indemnity made at the end of the trial was granted.

The vessel departed Newport News without any stability calculations having been made by the vessel personnel or by Popp or Fife. There were inadequate cargo documents on board with which to make accurate stability calculations. And without a composite cargo or stowage plan covering all cargo on board, it was difficult, if not impossible, for the crew to check the GM. The facts established on the trial included a showing that the vessel departed Newport News with an excessive GM, that is, in a very "stiff" condition which tended to increase the frequency and severity of the rolling of the vessel, with consequent additional stress on the lashings.

In addition, the evidence disclosed that the vessel departed Newport News with two members of her deck crew missing. These crew members had deserted the vessel in New York and had not been replaced.

The vessel had no lookout assigned to it who had no other duties. Intermarine, the managing agent for the owner, was aware of the custom of the Mari Boeing of not employing a lookout who had no other duties. It made no investigation to insure that only qualified crew members were employed. Crew members were supplied by Union Marine, another agency in Taiwan, at the request of Intermarine.

Before leaving Newport News the vessel had been sent a routing advice message from a weather routing service employed by MTO/Atlanta. The message recommended that upon departure from the Newport News area the vessel should proceed directly south to the vicinity south of Bermuda and then cross the Atlantic to Gibraltar. This advice had been given in order to avoid rough weather and seas which had been forecast for the area north of Bermuda. The master did not heed this message. He proceeded to an area north of Bermuda.

By 0700 hours on December 25, weather and sea conditions had deteriorated, as predicted by the weather advices which the master had not heeded. Although the weather had not become severe at that juncture but was at expectable levels, the master observed that the cranes on the No. 1 hatch cover had moved. The houses had also moved and the crates of water pipe on the No. 2 and No. 3 hatch covers had become racked. Since the houses had settled and the crates had become racked, the wire and chain lashings holding these crates and houses had loosened even more. Because of the shifting of this heavy deck cargo, the bad weather, and the snap rolling of the vessel, the crew was unable to tighten the lashings on the cargo. The master and crew thereupon became fearful for their lives and the safety of the cargo. Moreover, no catwalk had been provided to enable the crew to walk fore and aft without stumbling over lashings on the crowded deck cargo. The master sent radio messages to Intermarine and MTO reporting the movement of the deck cargo. He requested instructions. He also complained of the situation with respect to the cargo. The master requested permission for the vessel to change course and to deviate to Bermuda to restow and resecure cargo. The master understood from the messages he received that the owners and the charterers had approved the vessel's deviation to Bermuda.

The master, the chief mate, the navigating officer and other officers of the vessel had never been to Bermuda before and were unfamiliar with the sea conditions around that island. Well before the vessel arrived in waters off Bermuda the weather and sea conditions had improved. The master sent a radio message to Delphinus' managing agent, Ossmarine, in Bermuda on 26 December at 1330 GMT advising of the vessel's estimated time of arrival at Bermuda about 0600 hours in the morning of December 27, requesting a pilot to bring the vessel into the harbor on the southern coast of Bermuda, and further advising that the ship did not have a chart of Bermuda on board. There was no large scale chart of Bermuda or its adjacent waters on board the vessel, despite the fact that a vessel which is proceeding from the East Coast of the United States to the Mediterranean would regard Bermuda and the Azores as two intermediate ports of refuge. The master and crew, having never been to Bermuda before, were totally ignorant of the fact that there is an extensive coral reef off the northwest coast of Bermuda which represented a special hazard to navigation. Ossmarine never responded to the message and nothing was done to try to get a chart to the vessel.

The normal underway deck watch of the vessel consisted only of a helmsman and the deck officer on watch. The chief mate had the deck watch on the morning of December 27. According to the master, a helmsman and the master were also on the bridge. However, a lookout who had no other duties was not posted. The master, the chief mate, and the other deckmen did not see a navigational aid, a lighted buoy known as North Rock Light, while the vessel was still proceeding well off the island before sunrise. This light was intended to warn mariners of the existence of the coral reef off the northwest coast of Bermuda.

Accordingly, the court finds that the unseaworthy "stiff" condition of the vessel and the unseaworthy condition of the deck cargo on departure from Newport News, the gross negligence of Popp, the negligence of the stevedore, together with the negligence and incompetence of the master and the crew with regard to on deck cargo led directly to the request to deviate to Bermuda. The grounding of the vessel at 0453 hours on December 27 at a position about eight to ten miles from the island was a direct result of the foregoing unseaworthy conditions and negligence and the failure of the vessel to have a lookout with no other duties, the failure to have a large scale map of Bermuda on board, the failure of the master and crew to consult the Sailing Directions which were on board and which contained maps of Bermuda and adequate notice of the coral reef, and the failure of the vessel to have sufficient manpower on board.

The hull of the vessel was holed by reason of the grounding and water entered the vessel's cargo holds. Much of the cargo on board was damaged as a result. The voyage was abandoned by MTO/Atlanta. The vessel owner declared a General Average and appointed Messrs. Richard Hogg, International, to prepare a General Average Statement. Professional salvors (Smit) were employed to salvage the vessel and her cargo. Some of the cargo was discharged from the vessel while it was stranded and taken into port on barges. The vessel was free from her stranded position on February 26, 1979 and was towed into port in Bermuda. The remainder of the available cargo was discharged at berth.

Delphinus, Intermarine, MTO, Atlanta and Tidewater all claim they are entitled to exoneration. In the alternative, Delphinus claims it is entitled to limit liability to the alleged scrap value of the Mari Boeing after the grounding in the amount of $310,-000. The Mari Boeing has since been repaired, is still owned by Delphinus, and is once again carrying cargo. The vessel owner and the charterer seek damages from each other. If found liable, the vessel owner, the charterer and the stevedore each claim indemnity and/or contribution from the other.

## I. *Liability of the Vessel Owner and its Agent, Intermarine*

■ Although the first action filed is denominated a limitation proceeding, it is primarily an action brought by the shipowner for exoneration from liability of any kind. It is only secondarily an action to limit the owner's liability to the value of the damaged vessel. Under the statute, Title 46 U.S. § 183, exoneration is the result if there was no fault on the part of the vessel owner. If there is fault, but the owner sustains its burden of proving lack of privity and knowledge, recovery is limited to the value of the vessel and its pending freight. *Tittle v. Alda Costa*, 544 F.2d 752, 756 (5th Cir. 1977). In this case, the vessel owner, Delphinus, claims that there was no fault on its part or on the part of any of its agents or employees. It further claims that if there was fault on the part of any of its agents or employees, it had no personal knowledge of the fault. More specifically, Delphinus claims that it had no knowledge that the vessel was unseaworthy before it left Newport News, Virginia on December 23, 1978, and is, therefore, not personally liable for any unseaworthy condition which may have contributed to or caused the cargo damage in this case.

The proof disclosed that Delphinus, a Liberian corporation, had no office of its own anywhere in the world. The only shareholder of Delphinus was a Mr. Cheng who was also the president of Delphinus and chairman of the board of directors of Intermarine. Intermarine was the exclusive managing agent of Delphinus in the United States. Delphinus' mailing address in New York was the same as Intermarine's. Mail was sent to Delphinus in care of Intermarine. Intermarine kept Delphinus' stationery in its offices and sent out letters for Delphinus. These letters were also signed by Intermarine for Delphinus. It was Intermarine that retained Mr. Alan Fife, an independent surveyor, to protect Delphinus' interests at Newport News and

to report to it any unseaworthy condition respecting the cargo, particularly the loading of cargo on deck. The owner had expressed particular concern to the charterer about loading cargo on the deck. The owner finally agreed to have cargo, including dangerous cargo, loaded on the deck and retained Mr. Fife to protect it in this regard as required by its property and indemnity insurers. .

■ Having brought this action, the initial burden was on the vessel owner to show no fault on its part or if there was fault, that the fault was without personal knowledge. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). This burden the vessel owner failed to carry. Title 46 U.S.C. § 192

provides that if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall "exercise due diligence" to make the vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, its owner or the owner's agents or charterers shall become or be held responsible for damage or loss resulting from negligence in navigation or in the management of said vessel or from saving or attempting to save life or property at sea or from any deviation in so doing. The court finds and concludes that the owner of the vessel failed to use due diligence to make the vessel seaworthy, that the vessel was unseaworthy before it left Newport News, Virginia, and that this unseaworthiness was with the owner's privity and knowledge for the following reasons: [1]

1. *Seaworthiness Defined*

Section 3(1)(a) of COGSA, 46 U.S.C. § 1303(1)(a), imposes on a carrier the duty to exercise due diligence to make the vessel seaworthy. "The standard of seaworthiness requires that the ship be reasonably fit for the use intended." *Amerada Hess Corporation v. S/T Mobil Apex*, 602 F.2d 1095, 1097 (2d Cir. 1979). The Court of Appeals for the Second Circuit in *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979), further elaborated the definition of seaworthiness:

"Seaworthiness is a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion.... [The shipowner] had a nondelegable duty to provide a qualified master and crew for the intended voyage...." (Citations omitted.)
*Particular Indicia of Unseaworthiness*

1. *Inadequate Crew*. The Court of Appeals in *Tug Ocean Prince, Inc., supra*, 584 F.2d at 1156, also held that if the ship was manned by an inadequate crew, the shipowner's duty was breached on either the theory of negligence or that of unseaworthiness. A condition of unseaworthiness may exist due to an inadequate crew, either in number or in competence. *Cerro Sales Corp. v. Atlantic Marine Enterprises, Inc.*, 403 F.Supp. 562, 567 (S.D.N.Y.1975).

2. *Improper Stowage*. Section 1303(2) of 46 U.S.C. states that "the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." The shipper is entitled to the usual and ordi-

nary stowage sufficient to meet conditions reasonably to be anticipated. *Schroeder Bros. v. The Saturnia*, 123 F.Supp. 282, 286 (S.D.N.Y. 1954), *aff'd*, 226 F.2d 147 (2d Cir. 1955). The court in *Schroeder Bros., supra*, held the carrier liable for loss to the cargo because of its failure to use dunnage in stowing the cargo. The court stated that this failure made the ship unseaworthy as to the particular cargo on board.

The court in *New Rotterdam Insurance Co. v. S.S. Loppersum*, 215 F.Supp. 563 (S.D.N.Y. 1963), held that where unboxed automobiles were stowed in the hold on top of dunnage over steel pipes and tubes which were subject to shifting and the automobiles were secured by Hercules rope, the manner of stowage was not sufficient to protect the cars in the event the ship should roll in heavy weather.

In a similar case, *Freedman & Slater, Inc. v. M.V. Tofevo*, 222 F.Supp. 964 (S.D.N.Y.1963), the court held that placing a shipment of compact automobiles over cargo, which did not give a level floor and provided a poor foundation, and inadequately lashing the cars constituted negligence and improper stowage. The court stated that the shipowner had a duty to provide reasonably safe and secure stowage commensurate with the nature of the cargo involved, the vessel, the time of year, the route of the voyage and the weather to be reasonably expected.

3. *Improper Navigational Practices*. Incompetence of the navigator makes the vessel unseaworthy. *Tug Ocean Prince, Inc., supra*, 584 F.2d at 1156. "A vessel may be rendered unseaworthy, not only by a physical condition, but by an improper navigational practice." *Complaint of Thebes Shipping, Inc.*, 486 F.Supp. 436, 455 (S.D.N.Y.1980). In *Complaint*

The master and the crew of the Mari Boeing were not reasonably competent. There were insufficient crew members when the vessel left Newport News. There was no lookout on board the vessel who had no other duties. *See Tug Ocean Prince, Inc. v. United States, supra,* 584 F.2d at 1155, 1156, 1159; *Cerro Sales Corp. v. Atlantic Marine Enterprises, Inc.,* 403 F.Supp. 562, 567 (S.D.N.Y.1975). The cargo on board the vessel on the No. 1, 2, 3 and 4 hatch covers and in the No. 1 hold had been improperly loaded, secured and stowed. *See New Rotterdam Insurance Co. v. S.S. Loppersum,* 215 F.Supp. 563 (S.D.N.Y.1963); *Freedman & Slater, Inc. v. M.V. Tofevo,* 222 F.Supp. 964 (S.D.N.Y.1963). The cranes on the No. 1 hatch cover had been improperly loaded athwartship. The evidence disclosed that another type crane should have been used to load the cranes fore and aft. The cover on the No. 1 hatch cover had not been properly closed and secured. The cargo had been improperly *loaded* in that the houses should not have been stowed on the crates of pipe without a wooden platform having been erected over the pipes or the erection of some other wooden side shorings for the pipes to insure that they would not move. The cargo had also been improperly *secured* in the respects just noted. There were insufficient chains on board and, as a result, less secure wire had been used on the cranes on the No. 1 hatch cover and on the crates of pipe. The cranes and houses had been placed not directly on the hatch cover but on loose dunnage. The wheels of the cranes were not properly cribbed and chocked to prevent them from rolling. Some of the lashings on the houses and cranes had been left loose by the stevedore before the vessel left port and had not all been properly tightened by the crew after the vessel left port with respect to the cranes on the No. 1 hatch and the chains

which held the houses on top of the crated pipes. The vessel was also unseaworthy in that it was too "stiff" when it left Newport News, resulting in increased frequency of the rolls of the vessel and further strain on the loose lashings. The vessel was unseaworthy in that it failed to have a large scale map of Bermuda on board. *See Complaint of Thebes Shipping, Inc.,* 486 F.Supp. 436, 455–458 (S.D.N.Y.1980).

The owner of the vessel (as well as the charterer) through its agents on board the vessel and through Intermarine, its managing agent, had actual notice of all of the foregoing unseaworthy conditions before the vessel left Newport News. More particularly, Mr. Fife, the owner's representative was on board to protect the owner's interest, particularly in seeing that the on deck cargo was properly loaded. He knew all the facts of his own knowledge and attempted unsuccessfully to reach Intermarine by phone to advise it of the existing deficiencies respecting the on deck cargo. These deficiencies were admitted by Intermarine's agent, Mr. James Chen, on the trial, to be such as to render the vessel unfit to go to sea.

█ It is well-settled that the shipowner's liability may not be limited pursuant to 46 U.S.C. § 183 when the negligence was that of an executive officer, manager or superintendent whose scope of authority involved supervision over the phase of the business out of which the loss occurred. *Coryell v. Phipps (The Seminole),* 317 U.S. 406, 410–412, 63 S.Ct. 291, 293–94, 87 L.Ed. 363 (1943); *Petition of the United States Dredging Corporation,* 225 F.Supp. 730, 732 (E.D.N.Y.1964); *Complaint of Flota Mercante Grancolombiana, S.A.,* 440 F.Supp. 704, 718 (S.D.N.Y.1977). Moreover, the Court of Appeals for this Circuit recently held in *Tug Ocean Prince, Inc. v. United States, supra,* 584 F.2d at 1155:

*of Thebes Shipping, Inc., supra,* the court held that the action of the captain in making improper adjustments of the steering gyrocompass, the owner's failure to make thorough inquiry into the condition and operation of the gyrocompass, failure to make repairs on cables of the radio direction finder and lack of a current pilot chart all made the vessel unseawor-

thy. The court concluded that the causes of the grounding of the ship were general mismanagement and neglect by the owner, combined with navigational errors of the officers during the voyage, and that the owner therefore was not entitled to exoneration from liability under § 1304(2)(a).

"It is the owner's duty to use due and proper care to provide a competent master and crew and to see that the ship is seaworthy; any loss occurring by reason of fault or neglect in these particulars is within his privity."

 The evidence established that Intermarine was the exclusive managing agent of the vessel in the United States. It had broad duties and authority with respect to the manning, equipping, operation and supervision of the vessel and its cargo and personnel. It appointed Fife, a marine surveyor, to protect the owner's interests at the time of loading in Newport News. However, Intermarine was not available by telephone, as planned, before the vessel set sail so that Fife could report to it. Fife protected himself by having the master who also knew all the facts sign a note enumerating certain defects. The court finds that Intermarine was negligent in failing to insure that the vessel was seaworthy in several respects before it left port. It failed to: (1) check the credentials of the crew; (2) furnish a lookout with no additional duties; (3) failed to replace the two crew members who had jumped ship in New York; (4) failed to furnish a large scale map of Bermuda; and (5) failed to ensure that its agent, Mr. James Chen, or one of its other officers could be reached by telephone for advice and direction before the vessel sailed on December 23, 1978. The plan was to have Mr. Fife call Mr. Chen at his home or at his parents' home. Mr. Fife did so but both Mr. Chen and his parents were not at home. The evidence disclosed that a telephone answering service could have been used or an urgent incoming cable arrangement employed.

 The court also finds that but for the "stiff" condition of the vessel and the improper loading and securing and stowage of the deck cargo which existed when the vessel left port, the vessel would not have been required to deviate to Bermuda.

The court further finds that the failure to have a lookout who had no other duties, the failure to have a large scale map of Bermuda on board, and the failure to have sufficient crew on board the vessel had a direct, causal connection to the grounding. The evidence disclosed that a lookout would have seen the North Rock Light near Bermuda which was several miles off the danger area and which the master claimed that he did not see.

The duty to maintain a proper lookout was required by statute and recognized by the Supreme Court. 33 U.S.C. § 1602, Rule 5; *The Ariadne*, 80 U.S. 475, 478–479 (1872). Since the failure to post a lookout was not only negligent but also a violation of statutory duty, *The Pennsylvania* rule applied and the vessel owner had the burden of proving that the violation could not have been one of the causes of the damage. *The Pennsylvania*, 86 U.S. 125, 136 (1874); *The Denali*, 105 F.2d 413 (9th Cir. 1939). The shipowner did not meet its burden of showing that by all reasonable probabilities its failure to maintain a lookout did not contribute to the cause of the grounding. This alone is enough to deny Delphinus limitation of liability. *Tug Ocean Prince, Inc. v. United States, supra*, 584 F.2d at 1160. Moreover, the master admitted that Intermarine knew of the practice of not having a lookout. Intermarine admitted that it did not look into the matter of providing a lookout or into any other problems regarding crew before the vessel sailed.

The court finds that one cause of the grounding of the vessel was the neglect and fault of the master who failed to consult small charts, which would have been found in the Sailing Directions aboard his vessel, and the Light List on board the vessel which would have alerted him to the reef off the coast of Bermuda and the existence of North Rock Light. The court also finds that the deviation to Bermuda was necessary to save life and property.

The court finds, however, that the unseaworthiness of the vessel and its cargo which existed before the vessel left Newport News and which was known to the owner through its agents, was a proximate, con-

current cause of the grounding.[2] Therefore, the vessel owner is not entitled to exoneration from or limitation of liability under §§ 183 and 192. *See The Louise*, 58 F.Supp. 445 (D.Md.1945).

## II. Liability of the Charterer And Its Agents

■ Under the Carriage of Goods By Sea Act (COGSA), Title 46 U.S.C. § 1304(2)(a) and (1), it is provided that neither the *carrier* nor the *ship* shall be responsible for loss or damage arising or resulting from any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship or in saving or attempting to save life or property at sea. The COGSA also provides that the *carrier* shall not be liable for any loss resulting from any deviation in saving or attempting to save life and property at sea. § 1304(4). The shipowner is entitled to this exemption under § 192 only as noted above. Under COGSA, the owner as well as the charterer in this case are deemed carriers since the charterer issued the clean bills of lading which were put in evidence. Title 46 U.S.C. § 1301(a). *Demsey & Associates v. S.S. Sea Star*, 461 F.2d 1009, 1015 (2nd Cir. 1972); *Nichimen Company v. M.V. Farland*, 462 F.2d 319 (2nd Cir. 1972). Once the carrier has demonstrated that there was a cause of the damage which falls within one of the exceptions under § 1304, the burden shifts to the cargo claimants to show that there was some concurrent cause of the loss arising from the fault or neglect of the carrier. *Vana Trading Co., Inc. v. S.S. "Mette Skou"*, 556 F.2d 100, 105 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). Cargo claimants have established that the cargo on board the vessel was improperly loaded, and secured, and stowed and that the vessel was unseaworthy in the several other respects enumerated above as a result of the fault and neglect of the charterer and its agents. The court therefore holds that the charterer is liable to the cargo claimants.

Once the cargo claimants have shown a concurrent cause of the loss arising out of the fault and neglect of the carrier, the burden shifts to the carrier to show what proportion of the loss is attributable to its own fault or the fault of its agents and which is attributable to any exemption. The charterer and the vessel owner will have an opportunity on the trial of damages to make this apportionment. *Vana Trading Co., Inc. v. S.S. "Mette Skou", supra* at 105–106.

Captain Popp, who had been hired by MTO/Atlanta as port captain, not only improperly left the vessel before the loading had been completed but had also been advised of the defects by Fife, the master, and the stevedore by telephone.

The stevedore, who had been hired by Popp for MTO, managing agent of the charterer, had full knowledge of the fact that the cranes were loaded athwartship rather than fore and aft as originally planned by it and Popp and the master, since the stevedore actually did the loading. The stevedore was fully aware and could reasonably have foreseen that this arrangement could prove hazardous to the cranes and other cargo on board the vessel and to the vessel itself. *Hartnett v. Reiss Steamship Co.*, 421 F.2d 1011 (2nd Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 49, 27 L.Ed.2d 90 (1970). This awareness led to the discussion with Popp. The stevedore also was aware that it was hazardous for the houses to have been stowed on top of three tiers of water pipes (which have a natural tendency to roll) without further securing to insure that the pipes could not move and could

---

**2.** In *Tug Ocean Prince, Inc. v. United States, supra*, as in the case at hand, the grounding of the ship did not occur because of a single separate incident. Rather, the court held that it was the result of an accumulation of acts, all of which originated with the owner's management, resulting in an easily foreseeable casualty. Where the owner

"... by prior action or inaction set into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty, the right to limitation is properly denied."
584 F.2d at 1158.

reasonably have foreseen that this arrangement could result in damage. *Hartnett, supra.* The stevedore's men also failed to properly tighten all of the lashings before leaving the vessel as they agreed to do and could reasonably have foreseen that the cargo would shift because of loose lashings. The court finds that the negligence of the stevedore was a concurrent, proximate cause of the deviation and subsequent grounding. *Luigi Serra Inc., v. S.S. Francesco C.,* 379 F.2d 540 (2nd Cir. 1967).

The master of the vessel had talked by phone to Popp about the problems about which he had been advised by Mr. Fife, including the opening in hatch cover No. 1 and the loading and stowing of the deck cargo before the vessel set sail. Nevertheless, at Popp's insistence, the vessel left port as scheduled without correcting all of the deficiencies noted and, particularly, without properly closing and securing the hatch cover on the No. 1 hatch, without checking all lashings on the cranes, and without requiring further security for the crates of pipe. The master did not understand that he was not to leave unless the loading and stowing had been approved by Fife, as the owner's representative, because of a failure of communication between the master and the managing agent of the vessel, Intermarine. The master believed that Popp, the charterer's agent, had the final word as to when the cargo had been properly loaded secured and stowed so that the ship could sail. The master followed Popp's advice that (with certain corrections noted by Fife which could be taken care of after the ship sailed) the vessel should leave as scheduled.

The court also finds that everyone involved, except the crew, wanted to get home for the Christmas holidays and that Popp wanted to save money and, therefore, let the vessel leave in an unseaworthy condition. Popp believed that neither the owner nor the charterer was willing to sustain the extra expense which keeping the vessel in port would have entailed to properly close the hatch cover, to properly load the cranes, and to properly secure the pipes. Popp was also unwilling, because of the Christmas holidays, to remain on board until the loading and stowing and securing of the cargo had been completed. The court finds that, in view of the problems encountered in loading and securing the deck cargo, Popp's decisions to leave the vessel early and to allow the vessel to sail was gross negligence on the part of Popp.

The stevedore and its men were also anxious to leave the vessel to begin the holiday and went along with Popp's manifestly hazardous loading suggestions simply to get the job done by midnight in accordance with its contract. In their haste to leave the vessel, the longshoremen failed to tighten all the lashings as required.

III. *Liability of the Stevedore, Intermarine and MTO to Cargo Claimants*

The court finds that the vessel owner, the charterer, the stevedore, MTO and Intermarine are all liable to the cargo claimants as owner, carrier and as joint tort-feasors. The carpenters and lashers were not made parties to this action. There is, of course, no privity of contract between the stevedore and the cargo claimants or between Intermarine and the cargo claimants. There is such privity between cargo claimants and MTO where MTO signed the bill of lading. The stevedore is liable to the cargo claimants because its negligence has been found to be a concurrent, proximate cause of the damage. *Fernandez v. Chios Shipping Co., Ltd.,* 542 F.2d 145 (2d Cir. 1976).

Intermarine and MTO are also directly liable to cargo claimants in tort for their negligence. An agent is not covered by the limitations of COGSA available to the carrier, and may be fully liable for its acts of negligence. *Cerro Sales Corp. v. Atlantic Marine Enterprises, Inc.,* 403 F.Supp. 562, 568 (S.D.N.Y.1975). The court in *Cerro Sales Corp., supra,* held that the managing agent, in its failure to provide a proper crew and properly to counsel in fire protection once it had assumed this managerial function, was negligent, and that this negligence was a proximate cause of the loss to the cargo. It concluded that the vessel owner and its managing agent were jointly

and severally liable to the cargo claimants. *See also Quinn v. Southgate Nelson Corporation*, 121 F.2d 190 (2d Cir.), *cert. denied*, 314 U.S. 682, 62 S.Ct. 185, 86 L.Ed. 546 (1941).

### IV. *Indemnity*

 The stevedore breached its duty of workmanlike performance to the shipowner and the charterer, which entitles the shipowner and charterer to indemnity, "absent conduct on [their] part sufficient to preclude recovery." *Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc.*, 355 U.S. 563, 567, 78 S.Ct. 438, 440, 2 L.Ed.2d 491 (1958); *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); *Demsey & Associates v. S.S. Sea Star, supra*, 461 F.2d at 1017. The rule in this Circuit is that indemnity by the stevedore is barred where the shipowner (or the charterer) and the stevedore are concurrently negligent and the shipowner or charterer was "the party best situated to adopt preventive measures and thereby reduce the likelihood of [damage]." *Hurdich v. Eastmount Shipping Corp.*, 503 F.2d 397, 401 (2d Cir. 1974); *Lopez v. Olendorf*, 545 F.2d 836, 839 (2d Cir. 1976), *cert. denied*, 431 U.S. 938, 97 S.Ct. 2650, 53 L.Ed.2d 256 (1977); *Doca v. Marina Mercante Nicaraguense S.A.*, 474 F.Supp. 751, 756 (S.D.N.Y.1979), *aff'd in pertinent part, vacated in part*, 634 F.2d 80 (2d Cir. 1980). The court finds that the negligent conduct of Popp, discussed above, and the negligence of Intermarine in not making itself available for consultation was such as to preclude indemnity of the shipowner or the charterer by the stevedore.

The stevedore would be entitled to partial indemnification by the shipowner and charterer for damages paid by it but which are not attributable to its negligence. *See Fernandez v. Chios Shipping Co., Ltd., supra*, 524 F.2d at 153 n. 13.

 The provision in Paragraph 8 of the time charter, that the "Charterers are to load, stow, trim and discharge the cargo at their expense under the supervision ... of the Captain," shifted responsibility for loading, stowing, trimming and discharge of cargo to the charterer. The charterer must therefore indemnify the shipowner for all damages resulting from the improper performance of the stipulated cargo operations for which the shipowner is held liable. *Fernandez v. Chios Shipping Co., Ltd., supra*, 524 F.2d at 151–152; *Nichimen Company v. M.V. Farland*, 462 F.2d 319, 331–332 (2d Cir. 1972). The charterer is entitled to indemnification from the shipowner only for damages paid by it but not attributable to the charterer's negligence.

SO ORDERED.